IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| JULIE LAWSON,<br>PLAINTIFF,<br><br>v.<br><br>SWBC MORTGAGE CORP.,<br>PENNYMAC LOAN SERVICES, LLC<br>DEFENDANTS. | Case No. 3:21-CV-197<br>JURY TRIAL DEMANDED<br><br>Aleta A Trauger, U.S. District Judge<br>Barbara D Holmes, Magistrate Judge<br><br>*Removed from Civil Circuit Court for*<br>*Williamson County, Tennessee* |

AMENDED COMPLAINT

Comes now the Plaintiff, Julie Lawson ("Lawson") and for her causes of action against the

Defendant, SWBC Mortgage Corp. ("SWBC"), and the Defendant, PennyMac Loan Services, LLC

("PNMAC"), would state to this Honorable Court as follows:

**I. The Parties and Jurisdiction**

1. SWBC is a Texas corporation authorized to do business in the State of Tennessee with

   offices in San Antonio, Texas. SWBC is also a fully licensed Lender through Tennessee

   Department of Financial Institutions.

2. PNMAC is a Delaware limited liability company that is licensed and authorized to do

   business in the State of Tennessee with offices in Westlake Village, California. PNMAC is

   also a fully licensed Lender through Tennessee Department of Financial Institutions.

3. Lawson is a Tennessee resident.

4. As set out below, this dispute involves amounts $75,000.

Case 3:21-cv-00197   Document 77   Filed 01/06/23   Page 1 of 65 PageID #: 1141

5. This Honorable Court has jurisdiction over this dispute under 28 U.S.C. § 1332 because it is a civil action between parties whose citizenship is completely diverse and the amount in controversy exceeds $75,000.

6. Venue is proper because, as set out below, this lawsuit involves disputes over the handling of Lawson's mortgage loan (the "Loan") and insurance proceeds (the "Settlement") for residential real estate at 7456 Sleepy Hollow Road in rural Williamson County, Tennessee (the "Property").

## II. The Contract Between Each Defendant and Lawson

7. Lawson incorporates by reference the allegations in paragraphs 1-6 of this Amended Complaint.

8. After the real property appraised at $245,000.00, the parties entered into a contract ("Deed of Trust and Promissory Note") on October 1, 2016 for a principal sum amount of $240,562.00. See Deed of Trust at ECF Doc. No. 61-1, pp. 2-12. See Promissory Note at ECF. Doc. No. 61-1, pp. 14-16. Collectively, the Deed of Trust and Promissory Note constitute an agreement (the "Contract") between Lawson and SWBC. There is no dispute as to whether the Contract existed. The Loan was secured using the Property as collateral as evidenced by the execution of the Deed of Trust in favor of MERS, as nominee for SWBC, which was recorded in Book 6890, pp. 141-152 with the Register of Deeds for Williamson County, Tennessee.

9. After Lawson purchased the Property through the Loan that Defendants serviced, she made regular mortgage payments to Defendants as a condition of the Contract. Lawson

Case 3:21-cv-00197   Document 77   Filed 01/06/23   Page 2 of 65 PageID #: 1142

continued her mortgage payments for almost a year after the Loan was paid off in full per the terms of the Contract.

10. Section 3 of the Deed of Trust provides that "Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender." See Deed of Trust at ECF Doc. No. 61-1, p6, first sentence.

11. Section 5 of the Deed of Trust included a provision requiring the application of insurance proceeds to the remaining principal sums owed when, after a loss to the Property, it was financially infeasible to restore what was lost. It provides, in relevant part, that SWBC made a covenant and agreement to the following terms in the event of loss: "If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2." Id. at pp. 6-7.

12. Section 5 of the Deed of Trust provides that the only condition upon which these entitlements would not apply to Lawson is if SWBC and Lawson had entered into a new written agreement. Id.

13. Section 15 of the Deed of Trust was to be governed by federal law and the law of the jurisdiction in which the Property is located. Id. at p.9.

14. Section 22(a) of the Deed of Trust has no provision allowing PNMAC to accelerate debt on the grounds of "default" without the existence of a payment default. Id. at p. 10.

15. Section 25 of the Deed of Trust included a provision requiring PNMAC to release the Deed of Trust upon payment of all sums secured by it. Id. at p. 11. It provides that Lawson is

entitled to the benefits that would have occurred had SWBC released the Contract at the time Lawson paid all sums secured by the Contract. Id.

16. There is no dispute that SWBC sold the Loan to PNMAC. The Notice of Transfer stated that, "The servicing of your home loan is being transferred, effective November 2, 2018. This means that after this date, a new servicer will be collecting your home loan payments from you. Nothing else about your home loan will change." See ECF Doc. No. 12-3 at p. 40-41.

17. A Quit Claim Deed was signed by Lawson's ex-wife on October 8, 2018 as part of Lawson's divorce. See Quit Claim Deed at ECF Doc. No. 61-1, pp. 18-20.

18. When Lawson was entitled to the application of the Settlement to the principal balance of the Loan, SWBC was required to apply it on the spot. SWBC was further required to apply it in a specific sequence.

19. Upon transfer of the Loan to PNMAC, Lawson remained entitled to the application of the Settlement to its principal balance. PNMAC was further required to apply it in a specific sequence.


### III. The Policy

20. Lawson incorporates by reference the allegations in paragraphs 1-19 of this Amended Complaint.

21. Lawson obtained an insurance policy (the "Policy") from Farm Bureau (the "Insurer") when purchasing the Property on or about October 1, 2016 to protect its value.

22. Lawson made regular payments for the security of the Policy.

23. See the Policy's "How Losses are Settled" section at ECF Doc. No. 12-2, p. 20. This section is titled "How Losses Are Settled" and set forth the following terms: "Loss to property covered under this policy will be settled as follows.

> 1. Under Coverages A and B we will pay the actual cost to repair or replace covered structures, but only to the extent of the damaged portion thereof, including commercially reasonable general contractor overhead and profit incurred within 18 months after the loss, and for equivalent construction and use on the same premises, subject to the following:
>
> a. Until actual repair or replacement is completed, we will pay the actual cash value of the damage to the structures, not to exceed the replacement cost of the damaged part of the structure for equivalent construction and use on the same premises.
>
> b. If the amount you actually and necessarily spend to repair or replace the damaged structures exceeds the applicable limit of liability shown in the Declarations, we will pay the additional amounts when the repair or replacement is actually completed not to exceed: i. 20% of the Coverage A limit shown in the Declarations for Coverage A — Dwelling; or ii. 2% of the Coverage A limit shown in the Declarations for Coverage B — Other Structures.
>
> To receive any payments under b.i. or b.ii. above, you must notify us in writing within one hundred eighty (180) days of our receipt of your proof of loss of your intent to repair or replace the damaged part of the covered property. In addition, we will only pay the costs of repair or replacement of the damaged part of the covered property that are incurred within two (2) years from the date of loss."

> c. We will not pay for increased costs resulting
> from enforcement of any ordinance, code or law
> regulating the construction, repair, or demolition
> of a dwelling or other structures.
>
> d. If stabilization or restoration of land is
> necessary to repair or replace the covered
> damaged structures on the same premises, we
> will pay up to $5,000 to stabilize or restore the
> premises after repair or replacement of the
> damaged structures is completed."

24. Lawson's home burned down on the morning of November 29, 2017, and the Insurer's

    Adjuster declared the home and her belongings a total loss the same morning. Among

    Lawson's losses to the housefire were all food, clothing, virtually all belongings, and

    shelter.

25. The fire report estimated a $300,000.00 property loss from the housefire.

26. On December 21, 2017, Lawson settled the claim with the Insurer for $218,400.00, which

    exceeded the amount on her Declaration Page but was significantly insufficient for

    covering the cost to rebuild the Property. See Declaration at ECF Doc. No. 12-2, p. 18.

27. Lawson is unaware of her insurer breaking any law that caused her harm.

28. SWBC received the endorsed check within approximately two days, and they allege to have

    deposited the check to a restricted escrow account. Additionally, per verbal and written

    instruction by SWBC, Lawson overnighted a letter of intent to rebuild.


**IV. Tennessee Consumer Protection Act**

29. Lawson incorporates by reference the allegations in paragraphs 1-28 of this Amended

    Complaint.

30. The Tennessee Consumer Protection Act prohibits "unfair or deceptive acts or practices affecting the conduct of any trade or commerce." Tenn. Code Ann. § 47-18-104.

31. The following acts or practices violate the Tennessee Consumer Protection Act: Representing that a consumer transaction confers or involves rights, remedies or obligations that it does not have or involve or which are prohibited by law. See Tenn. Code Ann. §47-18-104(b)(12). Representing that a service, replacement or repair is needed when it is not. See Tenn. Code Ann. §47-18-104(b)(13). Using unfair or deceptive acts or practices affecting the conduct of any trade or commerce constitute unlawful acts or practices (a Class B misdemeanor). See Tenn. Code Ann. §47-18-104(a). Refusing to reasonably show, demonstrate or sell goods or services offered in accordance with the terms of the offer, which should be considered when determining if its offer to sell goods or services was bona fide. See Tenn. Code Ann. §47-18-104(c)(1).

32. "To make out a claim under the TCPA, a plaintiff must establish: (1) an ascertainable loss of money or property; (2) that such loss resulted from an unfair or deceptive act or practice; and (3) that the act or practice is declared unlawful under the TCPA." Amour v. Bank of Am., N.A., No. 1:13-CV-144, 2013 WL 6497821, at *5 (E.D. Tenn. Dec. 10, 2013). The Tennessee Supreme Court has described a deceptive act or practice as "a material representation, practice, or omission likely to mislead…reasonable consumers to their detriment." Moore v. BAC Home Loans Servicing, LP, No. 11-2845-P, 2012 WL 13020708, at *3-4 (W.D. Tenn. Sept. 11, 2012).

33. The Act defines "trade, commerce, or consumer transaction" in part as "offering for sale, lease or rental, or distribution." Tenn. Code Ann. § 47-18-103(19).

34. The TCPA has a 1-year statute of limitations from a person's discovery of the unlawful act or practice. Tenn. Code Ann. § 47-18-110. In Tennessee, a claim accrues when the plaintiff discovers her injury or through the exercise of reasonable care and diligence, it should have been discovered. Mackey v. Judy's Foods, Inc., 867 F.2d 325, 328 (6th Cir. 1989).

**V. Factual Averments**

35. Lawson incorporates by reference the allegations in paragraphs 1-34 of this Amended Complaint.

36. This dispute is about Defendants' handling of Lawson's Settlement for the Property. Lawson was unable to rebuild her home on the Property after it burned down ("the Rebuild") and suffered several losses as a result.

37. Lawson has material evidence of each claim in this Amended Complaint or believes she can reasonably obtain the material evidence during Discovery.

38. Table 1 of this action provides a timeline of the primary events regarding breaches of contract before Lawson's health was impacted. Table 2 provides a continued timeline of the primary events regarding breaches of contract, including the duration of Lawson's severe health impacts.

39. Covenant 5 of the Contract came to life upon the destruction of Lawson's home. It is unreasonable and abnormal for a lender to wait years after an affirmative obligation comes to life before fulfilling it. Covenant 5 of the Contract was not contingent upon any action of Lawson's beyond supplying her endorsed Settlement check. One of two conditions were needed for Defendants' obligation to come to life, requiring them each to

apply Lawson's Settlement to the principal balance of her mortgage loan. One of those predicates was to analyze the cost of replacing Lawson's home as compared to her economic capacity to rebuild. SWBC had the knowledge, material evidence, and ability to act on its obligation as of acquiring Lawson's mortgage loan on December 11, 2017. PNMAC had the knowledge, material evidence, and ability to act on its obligation as of acquiring Lawson's mortgage loan on November 2, 2018. Had the rebuild been economically feasible, then PNMAC would have been obligated to also analyze whether the ending rebuild value would be less than its initial appraisal at the time of purchase. The Rebuild was clearly economically infeasible, making the need to analyze further moot. If either of these conditions were not met, the Contract explicitly required the sums to be applied to the balance of Lawson's Note, whether or not then due.

40. SWBC sent Lawson an allegedly comprehensive Claim Processing Packet (the "Instructions"), dated December 21, 2017, telling Lawson false requirements for processing her claim and omitting the relevant terms of the Contract. See SWBC's Instructions at ECF Doc. No. 61-1, pp. 22-38. SWBC's packet claims on its cover to be "Everything you need to process your claim in 3 easy steps!" Id.

41. Lawson did not know that SWBC's Instructions were misleading; nor was she aware that they contradicted the terms of the Contract. The Contract has no requirement for blueprints, new or old. There is no mention of them in either Defendants' written, "comprehensive" Instructions for processing Lawson's claim. On January 14, 2019, after Lawson had repeatedly requested PNMAC document their blueprint requirements in writing, Alexis Edwards ("Ms. Edwards") informed Lawson by phone that PNMAC refused

to provide a list of required documents and that the only additional documents that might be requested are considered "exceptions." The same day, two "exceptions" were currently in review, one for Lawson's septic repair needs and one request for some explanation as to why Lawson's conceptual plan had been denied. In December 2017, a Jane Doe employee of SWBC's said on a phone call that Lawson couldn't rebuild until she obtained the original house plans for her home that burned down. After investigating, Lawson let another Jane Doe employee of SWBC's know by phone that the original blueprints did not exist. Lawson was unable to locate the original Builder. Lawson believed that each Defendants' Instructions contained all instructions that she was to follow, and she followed those instructions to her detriment.

42. In December 2017, a Jane Doe employee at PNMAC said on a phone call that Lawson couldn't rebuild until she obtained the original blueprints. Lawson explained that they didn't exist and never heard back from SWBC on the matter.

43. On or about December 21 or 22, 2017, a Jane Doe, an SWBC employee in the Property Damage Claims Department, instructed Lawson to mail a signed letter of intent to rebuild if Lawson indeed wanted to rebuild her home. As mentioned previously, Lawson wanted to rebuild her home, so she obeyed the Jane Doe's instructions and the written Instructions, overnighting a signed letter of intent to rebuild with the endorsed $218,400.00 settlement check from the Insurer on December 22, 2017. The letter of intent to rebuild that SWBC told Lawson to send in no way indicated that Lawson was choosing with whom to rebuild, nor that she knew there was a choice involved.

44. Upon receipt of the Settlement check on December 23, 2017, SWBC had knowledge of Lawson's available proceeds for rebuilding. This is, likewise, when SWBC had control of Lawson's insurance proceeds. The Adjuster faxed his estimate ("Adjuster's Worksheet") to "Kay" at SWBC on January 11, 2018. Under the terms of the Contract, Plaintiff was not required to submit anything else related to her Settlement. Lawson was not required to submit any information that was not timely submitted. SWBC then had the ability to perform their obligation to Lawson to apply her proceeds to the sums owed on the Loan.

45. On December 5, 2017, the Adjuster provided the Insurer's initial estimate to rebuild, which totaled $260,755.50. SWBC and PNMAC considered the Insurer's replacement value estimate as its assurance of economic feasibility, not Lawson. Lawson repeatedly informed PNMAC from the same month it bought the Loan that the Adjuster's estimate was woefully underestimated and explained that it excluded many necessary building supplies and labor costs, such as for a foundation and wood flooring throughout. Lawson intends to obtain her own professional, credible estimates and valuations during Discovery. Under the Uniform Covenant of Section Five of the Contract, Lawson's obligation to rebuild her home was relieved because the cost to rebuild exceeded the value of her insurance proceeds. This inequity was the primary contributing factor to the difficulty Lawson had finding a professional Builder. She first had to use a friend in a somewhat similar line of work as a Builder before ultimately having to be her own Builder, obtaining approximately 70 verbal bids, a Builder's Permit, and creating several documents for the rebuild, including the following: a concept plan; itemized bid of all materials, labor, and tax necessary for the rebuild; an automated timeline that proportionately decreased with each bid item; her

Case 3:21-cv-00197   Document 77   Filed 01/06/23   Page 11 of 65 PageID #: 1151

own contracts; punch lists for each phase of the rebuild; and a proportionate three-dimensional model from which to build.

Although PNMAC repeatedly denied Lawson's request to be her own Builder beginning December 3, 2018, Lawson did all of this to have her own shelter again to which she was entitled and for which she was doing whatever it took to do her part for making that happen.

46. The current Amended Complaint does not assert any estimates or costs to rebuild that PNMAC has not already heard about on numerous occasions, including in the letter that Lawson appended to Lawson's initial Complaint. [1] See Exhibit 207 at ECF Doc. No. 52-2, p. 18. It is a demand letter dated March 12, 2020 from Lawson to PNMAC which includes five ways to calculate the economic feasibility of rebuilding, none of which show the Rebuild was feasible. The third of those calculations is at the top of page 17, where Lawson stated: "I also received over five bids from Builders for reconstructing the original home, all of which were over $300,000, as mentioned in my March 13, 2019 journal entry. In fact, one Builder actually laughed when I told him the amount of my claim!"

47. Bob Kennedy, a Builder with whom Lawson worked on house plans during December 2017 through mid-January 2018, informed her about Williamson County Codes stairwell requirements having changed since Lawson's home was originally built, rendering original blueprints moot. Mr. Kennedy drew up a home design and itemized bid for rebuilding

---

[1] When considering a motion to dismiss, a court may consider exhibits attached to the complaint, public records, items appearing in the record of the case and exhibits attached to the defendant's motion to dismiss so long as they are referred to in the complaint and are central to the claims contained therein without converting the motion to one for summary judgment. Rondigo, L.L.C. v. Township of Richmond, 641 F.3d 673, 680-81 (6th Cir. 2011); New England Health Care Emps. Pension Fund v. Ernst & Young, LLP, 336 F.3d 495, 501 (6th Cir. 2003) ("A court that is ruling on a Rule 12(b)(6) motion may consider materials in addition to the complaint if such materials are public records or are otherwise appropriate for the taking of judicial notice.")

Lawson's home during this time. His itemized bid was approximately $280,000.00-$300,000.00, which exceeded Lawson's insurance proceeds.

48. Northcutt Custom Homes, LLC estimated a replacement cost of $344,280.00, or $190 per square foot, for replacing what they considered a small, custom 1.5 story home with hardy board having a tall crawl space and no garage in Williamson County, Tennessee.

49. Covenant 7 of the Deed of Trust is about "preserving, maintaining, and protecting the value of the Property." Borrowers are obligated by terms in Covenant 7 to promptly make repairs when further damage is possible. Lawson had no home to preserve, maintain, or protect, nor an affirmative obligation to promptly repair a nonexistent thing. Further damage could not have plausibly occurred. The economically infeasibility of the Rebuild as it relates to Covenant 5 of the Deed of Trust makes Covenant 7 moot. Had Covenant 7 come to life, a required predicate of any Borrower obligation was Defendants' release of insurance proceeds, which was not provided. Covenant 7 of the Deed of Trust did not obligate Lawson to repair the Property, promptly or otherwise. Lawson's ability to obtain additional insurance proceeds based on a condition within the Policy should not have been controlled by PNMAC. Because the rebuild was inappropriately occurring through Defendants, Lawson's conditional opportunity to obtain additional proceeds could not have made the Rebuild economically feasible. Her opportunity to access additional proceeds was contingent on her ability to build 80% of her home under certain time constraints as her own Builder with no prior building experience. That time constraint was a year when Lawson requested to be her own Builder. It was reduced to six months when PNMAC finally released proceeds to break ground. (emphasis added) "Conditional economic

Case 3:21-cv-00197   Document 77   Filed 01/06/23   Page 13 of 65 PageID #: 1153

feasibility" does not equate to "economic feasibility." The conditional opportunity to access additional proceeds was never a guarantee. It is not normal for banks to take on unknown financial risks over which they have no control or to wait until a questionable risk becomes a certain risk to agree to something dependent on that risk or to verbally give borrowers control over large sums of money, especially when a contract expressly says any agreement must be in writing between the parties.

50. Lawson was not asked or obligated to borrow money to force economic feasibility of rebuilding where it did not exist. Nor could Lawson have done so. She no longer had collateral (no home). What Lawson needed if she were to successfully rebuild was for Defendants to apply the Settlement per the terms of the Contract and release her Deed so that she could obtain a proper construction loan. Lawson could and would have been able to rebuild through a construction loan promptly following the proper application of her Settlement and finalization of her divorce. Had a new agreement existed, a construction loan for the needed funds would have allowed Lawson to pay proportionately for what she had in value and could have afforded Lawson security by having a contract used for its intended purpose.

51. Lawson's diligence in attempting to rebuild her home was outrageously beyond reasonable to expect of a Borrower.

52. Lawson objectively and affirmatively alleges that the Rebuild was never economically feasible with either Defendant. Additionally, Lawson told a Jane Doe at SWBC by phone call as early as January 2018 and Tahita Dingle ("Ms. Dingle") at PNMAC by phone call as early as December 2018 that she could not cover the cost of the Rebuild. Lawson went so far as

to tell Ms. Dingle during the phone call that her ex-wife had taken $20,000 of other insurance proceeds that were for Lawson's lost belongings, but that Lawson had earmarked as buffer for the rebuild.

53. Neither defendant offered nor suggested a new written agreement to Lawson.

54. Each defendant had an affirmative duty and obligation to apply Lawson's Settlement to the principal balance of the Loan once they knew the Rebuild was economically infeasible. Lawson's desire to rebuild is unrelated to this obligation.

55. Lawson's depth of knowledge about economic feasibility is unrelated to Defendants' affirmative obligations to the terms of the Contract.

56. PNMAC also instructed Lawson to mail a letter of intent to rebuild if she wished to rebuild. Lawson has always wanted to rebuild and merely followed PNMAC's written Instructions (and verbal). She has been clear about this with Defendants at all times. Lawson would not have sold the Property if not for actions and inactions described herein.

57. Lawson believed the Rebuild must happen through a defendant because, from the beginning and still, Defendants have treated the Rebuild as an in-house matter and because the "comprehensive" Instructions each Defendant sent Lawson were limited to rebuilding with Defendants.

58. It was unreasonable for SWBC and PNMAC to direct Lawson away from the Deed of Trust by sending incomplete and wrong Instructions for processing her claim. It was unreasonable for Defendants to only include instructions for the Rebuild to occur with them. It was unreasonable for Defendants to exclude key legal terms from its "comprehensive" instructions for processing Lawson's claim, such as how economic

feasibility impacts with whom she rebuilds or what it is or anything about it at all. There is no provision in the Contract that Lawson, at any point, needed to be aware of or communicate about the economically feasibility of her rebuild for Defendants to become obligated to determine feasibility under the terms of the Contract.

59. It did not take PNMAC years after Lawson's housefire to conclude that her rebuild was economically infeasible. The record shows that PNMAC knew the rebuild was no longer possible when it finally permitted Lawson to break ground.

60. Assigning Lawson's Deed of Trust to PNMAC did not make SWBC's breaches of contract evaporate or erase its harmful conduct.

61. Each defendants' duties with respect to the Settlement are outlined in Paragraphs 5 and 7 of the Contract. In particular, Paragraph 5 states that, "any Settlement...shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible...If the restoration or repair is not economically feasible...the Settlement shall be applied to the sums secured by this Security Instrument."

62. Because Lawson was instructed to rebuild through each defendant, she reasonably thought her rebuild could only happen through extraordinary efforts on her part. Lawson thought she must go far above and beyond what should have been required of her to fulfill her desire to rebuild, and this is what she did in her efforts to regain shelter.

63. The following insurance proceeds were released from the Settlement for demolishing Lawson's home and attempting to fulfill a verbal, ever-changing requirement for blueprints. Lawson submitted all required paperwork for her Project Overseer on December 10, 2018. PNMAC approved that paperwork. PNMAC released proceeds to pay

the Overseer properly on January 12, 2019. After threatening Lawson with a lien on the Property for nonpayment, the Project Overseer quit on December 29, 2018 out of frustration over her interactions with PNMAC. Lawson submitted all required paperwork for the demolition of her home on November 16, 2018. PNMAC released proceeds to pay the Patriot Demolition crew properly on January 17, 2019. The owner of Patriot Demolition had threatened a lien on Lawson's property for nonpayment as well. After Lawson's first Architect became nonresponsive in early January 2019 amidst Lawson's difficulty in obtaining proceeds, Lawson submitted all "required" paperwork on January 22, 2019 for a new Architect, despite begging PNMAC repeatedly to not have to use one. Lawson had already presented her own conceptual plan and three-dimensional model of the rebuild to PNMAC. PNMAC had already approved the conceptual plan on December 26, 2019. (emphasis added)

64. Lawson first requested to be her own Builder in November 2018. Settlement proceeds for breaking ground were finally released on May 21, 2019. The record shows that PNMAC admits this was too late to rebuild. Lawson was not able to access needed additional proceeds in time for completing her rebuild. Lawson does not recall fulfilling any required documentation needs for the release of proceeds related directly to breaking ground. PNMAC refused to release Lawson's proceeds for breaking ground until having also spoiled Lawson's opportunity to access more necessary proceeds from the Insurer.

65. PNMAC continued allowing Lawson to believe that her only reality was to make full mortgage payments as they withheld her ability to gain value in the Property.

66. The value of the Settlement was harmed when 27 months passed without having applied the Settlement. (emphasis added) This was unlawful and outside the scope of servicing Lawson's Loan and outside its rights as afforded by the Contract.

67. Additionally, Lawson had no shelter during that time in exchange for her mortgage payments.

68. SWBC was not within its rights under the Contract to keep most of Lawson's monthly mortgage payments as interest from January 2018 through October 2018. PNMAC was not within its rights under the Contract to keep most of Lawson's monthly mortgage payments as interest from November 2018 through October 2019. PNMAC was not within its rights under the Contract to insist on Lawson retaining a licensed Architect, nor insisting she have the resulting blueprints approved by the City of Fairview, Tennessee. PNMAC was not within its rights under the Contract to keep a significant portion of Lawson's profit from the sale of the Property. PNMAC was not within its rights under the Contract to apply Lawson's Settlement to a fictitious outstanding loan balance. PNMAC was not within its rights under the Contract to hinder Lawson's access to 20% additional Settlement. PNMAC was not within its rights under the Contract to negatively impact the value of the Property. PNMAC was not within its rights under the Contract to accelerate Lawson's note after Lawson had paid the sums owed in full on January 31, 2019.

69. Lawson spent time on PNMAC, including two hours on the phone with "Jennifer," Ms. Edwards," and "Emmy" from PNMAC on January 31, 2019 trying to resolve the several unresolved issues piling on with PNMAC. While granular in nature, the issues are described here due to the impact to Lawson's health by the end of the call. Lawson was looking for

her Architect's checks were since all documents were approved on January 25, 2019. "Jennifer" informed Lawson that no check had been ordered and that no approval had been given to release the funds. Lawson informed "Jennifer" that she uploaded a second request for releasing funds to repair the septic system, an ordinarily necessary step before Williamson County Codes would issue a Builder's Permit. Lawson's first request had been denied. PNMAC had also recently applied her full December 2018 mortgage payment to an escrow account. This was one of many phone calls between Lawson and PNMAC to have her mortgage payment moved out of escrow and applied as labeled on the face of the check ("December 2018 Mortgage"). Lawson already had over $2,000.00 in her regular escrow account ($3,190.95 with Lawson's mortgage payment). Emmy read a January 25, 2019 note aloud from Lawson's account, which stated that PNMAC was in the process of posting Lawson's December 2018 payment to her account but that she was still considered delinquent. On the same call, Ms. Edwards claimed Lawson's misplaced mortgage payment had nothing to do with the Hazzard Insurance Department, while Emmy read another note on Lawson's account saying it was for the Hazzard Insurance Department. Requests to correct this error had already been declined twice. Toward the end of this two-hour call, which was no longer a rare event, Lawson's hands began to swell until she had to remove her ring. She stated that she could see and feel her body changing, asking Emmy to Google the symptoms before ending her call short of making her January 2019 payment. Immediately following the call, Lawson went to Dr. John Benitez's office, Medical Director in her office, and asked if he could check her blood pressure. He did, and Lawson's readings from both arms fell into the category medically defined as "Hypertension Crisis." She went

to her primary physician immediately and was diagnosed with Hypertension and Diastolic Dysfunction, given a prescription for the new illness, and sent for more tests. Lawson had never had high blood pressure before. Emmy called Lawson back while she was in route to her doctor's office for the Hypertensive Crisis to take Lawson's January 2019 payment over the phone.

70. The following day, on February 1, 2019, Lawson received her final denial for using her conceptual design in lieu of blueprints. Lawson let Ms. Dingle know about her health over a phone call. Lawson further explained to Ms. Dingle that PNMAC was impacting her job security and take-home pay. Lawson said she had had enough and could not go on like this. Ms. Dingle then stated that, "[a]s you are building back a small home, you have the option to pay off your mortgage." Lawson believed Ms. Dingle was referring to paying down Lawson's loan with remaining insurance proceeds, not paying it off. Based on this understanding, Lawson immediately replied that doing so would disqualify her from the additional 20% of insurance proceeds for rebuilding, place her underwater with her loan, and she would be left with two mortgages, one for a new home and one for completion of paying off her existing Loan. Further, Ms. Dingle's suggestion implied the use of a current effective date, was made two and a half months into Lawson's attempt to rebuild, creating new roadblocks to the Rebuild: (1) the need to begin planning from the start once more; (2) the need to find and obtain a construction loan, something about which Lawson was completely ignorant of at the time. Even if Lawson had believed she had the choice, which she did not, the timing of Ms. Dingle's statement would have made it a high-risk choice at best. Rather than clarify what she meant by her statement, Ms. Dingle's immediate

response was that "[t]he new home is not material consistent with the original home," so the Rebuild may not occur with her conceptual design despite having been approved once before. Ms. Dingle stated that the Rebuild would have to "more closely match the size and amenities of the home." Lawson gave Ms. Dingle reason-after-reason for the Rebuild being acceptable and closed the conversation by saying that she had extensively documented poor conduct on PNMAC's part for the handling of Lawson's claim and mortgage.

71. Lawson spent the next few days making calls to PNMAC to resolve the following open issues with PNMAC:

   a. Awaiting approval of Lawson's conceptual plan or feedback as to why it wasn't approved;

   b. Trying to get approval for a septic repair, something without which a Builder may not break ground in Williamson County, Tennessee;

   c. Lawson's January payment was being considered insufficient despite multiple assurances that it was the correct amount;

   d. The first reimbursement check for PNMAC having overcharged Lawson on several mortgage payments had still not been mailed to Lawson;

   e. Twelve days had passed, but Lawson's escrow analysis remained incomplete for determining what more PNMAC owed Lawson from the same overpayments;

   f. PNMAC's IVR phone system indicated that Lawson had a forbearance even though she never had one and was told at one point that such a thing doesn't exist at PNMAC;

   g. Why $990 was charged for Lawson's taxes when only $149 was paid; and

h. On Valentine's Day 2019, Ms. Dingle phoned Lawson to let her know that now

   Lawson's blueprints will also need to be approved by the City of Fairview before

   PNMAC will review or comment on them. She said that PNMAC refuses to give

   criteria against which to compare. The one bit of guidance that Lawson was able to

   pry from Ms. Dingle was that the rebuild must be of equal or greater value than the

   original appraisal from when Lawson purchased her home.

72. PNMAC's Vice President of Loan Services, Mr. Marchese, became involved two weeks later

   on February 16, 2019, after Lawson informed Ms. Dingle that she was preparing a formal

   complaint.

73. When Lawson knew without a doubt that her opportunity to rebuild had been spoiled, she

   had no choice but to place the Property on the market on September 11, 2019. This was

   not what Lawson would have chosen for herself.

74. PNMAC has committed unlawful insurance acts.

75. PNMAC's Loss Draft Department purports to be professionally equipped to handle

   insurance claim matters. Ms. Edwards worked for Ms. Dingle in this department.

76. The Spanish translation of the "Hurtado" name meaning is from the past participle of

   hurtar "to rob or conceal." See Ancestry.com. A PNMAC employee, Beatriz Hurtado, sent

   Lawson a letter dated January 3, 2020, advising Lawson that she was her new point of

   contact for Lawson's loan modification process and that no action was required of Lawson.

77. On January 14, 2020, "Stephanie," a PNMAC employee, told Lawson by phone that her

   restricted escrow balance was $158,688.82. This was $42,713 less than the $201,302

   Settlement that should have been her restricted escrow balance.

78. On January 21, 2020, Ms. Edwards called Lawson to let her know that the discrepancy was human error and that PNMAC maintains multiple systems requiring manual entry of financial data. She would not reveal to Lawson what systems were used.

79. Years late, on or about January 25, 2020, Ms. Edwards to document Lawson's account that she did not receive enough Settlement to rebuild, deeming the rebuild economically infeasible two years after the same proceeds were received by Lawson's original Lender (SWBC).

80. Years late, on or about January 25, 2020, "Crystal," employee at PNMAC, read a note to Lawson over the phone that she said Ms. Edwards had posted to Lawson's account within the last 24 hours: "It says that you didn't receive enough claim funds to repair your home." (emphasis added) Once "Crystal" read this, she became hesitant to provide further information, calling the notes "for in-house use," "quality key points," and "claim's speak." Excluding Ms. Edward's written logs intended for internal use only, PNMAC has at all times misrepresented to Lawson and treated her mortgage loan as though Lawson's insurance proceeds were sufficient.

81. When Ms. Edwards documented Lawson's account as having insufficient Settlement, it enabled PNMAC to permit Alice Rengstorf's ("Ms. Rengstorf") misapplication of Lawson's Settlement with an effective date two years too late.

82. Lawson was dependent on Ms. Edwards' actions if her Settlement were to be applied correctly to the balance of her home loan.

83. When Ms. Edwards documented Lawson's account as just described, it gave the appearance that her action had been made on Lawson's behalf.

84. At the time Ms. Edwards documented Lawson's account as just described, she understood Lawson never stopped wanting to rebuild. She was equally aware that Lawson had complained of the mishandling of her Settlement. And Ms. Edwards knew that only one settlement check was ever received and that the amount of proceeds Lawson received never changed. Ms. Edwards knew she was falsely representing Lawson's wishes about how the Settlement was to be applied. Although this is stated elsewhere, it is bears repeating with this paragraph that PNMAC permitted Ms. Edwards to insist verbally only that Lawson could not rebuild without first obtaining a city-approved set of blueprints designed by a licensed architect before PNMAC would consider the blueprints.

85. Ms. Edwards' actions contradicted Lawson's claim for payment or benefit pursuant to the Policy and the terms of the Deed of Trust.

86. The date by which Ms. Edwards statements about economic insufficiency became true occurred years prior when Lawson first submitted her endorsed insurance settlement check to her Lender as directed by her insurance Adjuster and Lender.

87. Ms. Edwards' conduct as described constitutes withholding or concealing how Lawson's Settlement should have been applied.

88. On January 29, 2020, Lawson faxed and fully read a letter aloud over the phone to Ms. Edwards stating that the Property was under a contingent contract to be sold. She also read that she wants to know about her demand statement and what will be done to immediately halt any negative foreclosure activity. Ms. Edwards assured Lawson that she would notify the relevant parties, including the Legal Team.

89. PNMAC's Legal Team is professionally equipped to handle insurance law.

90. A transaction by, between or among Lawson and an insurance professional for the purpose of obtaining the benefits of insurance qualifies as an insurance transaction, as defined by the Act.

91. An insurance transaction took place when Ms. Rengstorf applied, or had applied, Lawson's Settlement to the principal balance of Lawson's loan.

92. Having been assigned to and working on Lawson's account for weeks with PNMAC's Legal Team shows that Ms. Rengstorf had her finger on the pulse of Lawson's loan, claim, issues, and demands.

93. Ms. Rengstorf had unequivocal knowledge that applying Lawson's Settlement years late was not right or within the scope of the Contract. TN Code § 56-53-101 (2020)

94. On January 31, 2020, Ms. Rengstorf phoned Lawson. Ms. Rengstorf informed Lawson that, after working with Management" for weeks on the Loan, PNMAC "declined" to apply her Settlement retroactively. Ms. Rengstorf then proceeded to repeatedly ask Lawson if she wanted her Settlement applied immediately. Lawson said "no" ten times and told Ms. Rengstorf that would be fraud.

95. PNMAC's Legal Team permitted Ms. Rengstorf to pay down Lawson's mortgage loan with the Settlement with an effective date of February 3, 2020. Ms. Rengstorf's misapplication of the proceeds occurred years after it should have been applied to the principal sums owed at the time of Lawson's housefire. Ms. Rengstorf first applied Lawson's Settlement to what PNMAC referred to as delinquent payments, bringing Lawson's account current from PNMAC's alleged perspective.

Ms. Rengstorf took or appropriated $201,132.02 of Lawson's Settlement on February 3, 2020 with the intent of converting it to PNMAC's use, depriving Lawson of her Settlement and with callous disregard of Lawson's health.

96. Lawson later found a PNMAC notice, dated February 4, 2020, on her online PNMAC account. It was a notification that PNMAC had sold Lawson's home loan to Mass Mutual c/o Barings. (This is out of chronological sequence, but the day after Lawson found this notice, she emailed Ms. Rengstorf to ask questions about the notice. Having blind copied legal counsel and investigators within Mass Mutual and Barings, Lawson found a second notice on her PNMAC account 24 hours later. It was from PNMAC and notified Lawson of the sale of her loan back to PNMAC.)

97. It was reasonable for Ms. Rengstorf to believe that PNMAC had a duty to disclose the breaches of contract and true status of Lawson's payments and overpayments.

98. Nonetheless, "Ms. Rengstorf" called Lawson on February 5, 2020, to inform Lawson that she had applied the remainder of Lawson's insurance proceeds to the home loan with a February 3, 2020 effective date. Notable is that "Ms. Rengstorf" first applied Lawson's insurance proceeds to November 2019, December 2019, January 2020, and February 2020 mortgage payments that PNMAC falsely claimed was owed.

99. Ms. Rengstorf did not merely fail to disclose these, she took an affirmative action to prevent others from discovering the truth when she misapplied the Settlement and wrote a letter dated February 19, 2020 that contained twenty-three inaccurate statements. For example, saying her misconduct was per Lawson's request.

100. PNMAC violated the statute prohibiting PNMAC from fraudulently profiting from Lawson's insurance claim at Lawson's expense when Ms. Rengstorf deliberately misapplied, or had misapplied, the Settlement that Lawson was entitled to use for recovering losses resulting from her housefire.

101. Lawson received a notice of default and intent to accelerate dated February 6, 2020. Lawson sold her property on March 27, 2020, before PNMAC could act on PNMAC's intention to foreclose on the Property.

102. Using Lawson's Settlement to pay down Lawson's mortgage loan was, or was in connection to, Lawson's insurance transaction.

103. Lawson was dependent on the correct application of her Settlement to the balance of her home loan.

104. Ms. Rengstorf sent Lawson a letter on February 19, 2020, which stated that she had taken this action on Lawson's behalf.

105. Ms. Rengstorf knew she was falsely representing Lawson's wishes about how the Settlement was to be applied, because Lawson said "No" ten times just before Ms. Rengstorf did it anyway.

106. Lawson's claim for payment or benefit pursuant to the Policy contradicted the individual and collective actions of Ms. Edwards and Ms. Rengstorf.

107. Ms. Rengstorf' conduct as described constitutes withholding or concealing proper application of Lawson's Settlement.

108. But for conversations with Jane Doe SWBC employees and the instructions included in SWBC's allegedly comprehensive Claim Processing Packet, Lawson would not have believed

that her desire to rebuild had to be and should have been facilitated by her existing

Lender.

109. Lawson never received another communication from SWBC regarding her insurance

proceeds, including never receiving an escrow statement for the proceeds.

110. Lawson's divorce proceedings occurred from January 11, 2018 through approximately

October 8, 2018, during which time Lawson did not know who would end up owning the

Property. But for SWBC's breach of Uniform Covenant in Section Five of the Contract,

Lawson would have used this time to plan for the rebuild and work on her credit.

111. Lawson became the sole Owner of her property when Deb Krueger signed a Quitclaim

Deed for the Property on October 8, 2018.

112. On or about October 16, 2018, SWBC mailed Lawson a Notice of Servicing Transfer, which

explained that SWBC would transfer the servicing of Lawson's home loan to PNMAC

effective November 2, 2018 and nothing other than Lawson's Payee would change with her

mortgage loan. This is when PNMAC had possession and control of Lawson's insurance

proceeds in addition to Farm Bureau's estimate for replacing Lawson's loss. This is also

when PNMAC's agreement to honor Lender obligations in the Contract began.

113. At no point did Lawson see or receive an escrow statement for her insurance proceeds

from SWBC or PNMAC.

114. On or about November 12, 2018, PNMAC sent Lawson an allegedly comprehensive packet

of instructions for processing her claim. It was almost a duplicate of SWBC's packet,

likewise claiming on its cover to be "Everything you need to process your claim in 3 easy

steps!" The contents of PNMAC's claim loss packet are attached hereto as Exhibit 5. See

Exhibit 5. Lawson believed that PNMAC's Claim Processing Packet contained all instructions that she was to follow, and she followed those instructions to her detriment.

115. Lawson remained under the impression that her rebuild must occur through her current Lender.

116. On or about November 14 or 15, 2018, Lawson successfully faxed a request to be her own Builder, request for disbursement of funds, her Quitclaim Deed, and a copy of Farm Bureau's estimate to PNMAC. The first paragraph was the first of at least nine notifications Lawson made to PNMAC's Loss Draft Department that she only had one year in which to rebuild if she was to qualify for an additional 20% of insurance proceeds from Farm Bureau, most of which emphasized to PNMAC the impact their delays were having on her ability to access the needed proceeds. The second paragraph explained the trouble Lawson had obtaining a Builder. The final paragraph included a statement about Lawson's grit, resiliency, and ability to deal well with stress and change. This was a true statement when Lawson wrote it in 2018. She re-faxed these items on or about November 27, 2018 after being told by a Jane Doe at PNMAC that they had not received parts of the original November 14 or 15, 2018 fax.

117. PNMAC avers that December 5, 2018 is when they first told Lawson that blueprints were required. PNMAC told Lawson that she must fulfill a requirement that wasn't written anywhere, that PNMAC refused to document in writing, and that PNMAC kept changing. The fictitious, ever-changing requirement in this example was for blueprints. a. During a phone call on December 17, 2018, "Ms. Edwards" or a Jane Doe promised Lawson that payment for the demolition of her home would finally be overnighted to her and that it

was safe to allow Patriot Demolition to move forward with their work. Lawson allowed

Patriot Demolition, LLC and Buckeye Quality Construction and Remodeling, LLC to begin

solely based on "Ms. Edwards" alleged absolute certainty that Lawson would have the

ability to pay them upon completion of their work. The same day, "Ms. Edwards" denied

Buckeye Construction's Waiver of Lien again, this time because the project overseer's fee is

considered a partial payment. "Ms. Edwards" stated that all payments were required on

the project overseer's waiver, including payments for the demolition crew, surveyor, and

architect. Lawson stated for a third time that she preferred a total of three checks, one per

subcontractor. This was intended to prevent funds from being released prior to the

completion of work, while still being able to pay the project overseer and subcontractors

whose work was complete in a timely manner. Despite at least one subcontractor not

having fulfilled the terms of his contract, and despite Lawson's wishes "Ms. Edwards"

insisted on creating one check in the amount of $24,442.00 for all contractor fees

combined. "Ms. Edwards" said that the only way to split the payments up would be to

begin the approval process over again, which would take another four days to process.

Under the duress of threats from contractors for nonpayment, Lawson submitted the

Overseer's third waiver of lien to PNMAC for the full amount by the end of the day. Lawson

asked if she and the project overseer could cash the check together and create multiple

cashier's checks for distribution as work was completed. "Ms. Edwards" agreed that this

would work.

118. On or about December 18-19, 2018, Lawson's home was demolished. Buckeye

Construction oversaw the demolition.

119. Lawson wrote the following in a letter to PNMAC on December 21, 2018: "I have done everything that has been asked of me. Yet I keep being told that more exists at the last possible moment. PennyMac has put me in a very bad position and is obstructing my ability to obtain this money. And this is impacting my job. I've had to spend hours on the phone with PennyMac and hours documenting things that aren't in the packet I was sent. I'm paid hourly, so I'm out all that money in addition to losing political capital at my job. It is impacting whether I get blackballed in the construction community, and I almost had a lien put on my house yesterday because of it. I'm being yelled at, and my phone is blowing up with texts and calls. I'm going to be in the looney bin before it's all over, and it's PennyMac causing this mental strain. I've never encountered anything like it before. I've had the worst year of my life, and PennyMac is hindering instead of helping and partnering with me."

120. Instead, PNMAC stood squarely in her way, obstructing her ability to rebuild for months. During a phone call with "Ms. Dingle" on December 23, 2018, "Ms. Dingle" fully admitting that she knew Ms. Lawson was already worn down as a direct result of her interactions with PNMAC, only 33 days into her effort to rebuild through PNMAC.

121. On Christmas Eve 2018, Lawson sent a written request for PNMAC to provide a list of required documents beyond that of PNMAC's Claim Loss Packet, because PNMAC was requiring blueprints.

122. Also on Christmas Eve 2018, Lawson spoke with "Ms. Edwards." During the call, the following occurred: a. Lawson explained to "Ms. Edwards" that she was being threatened

with a lawsuit, liens, and late fees by Patriot Demolition and Buckeye Construction for nonpayment. This was not the first time this was communicated.

123. On or about December 26, 2018, Lawson informed "Tahita Dingle," head of the Loss Draft Department at PNMAC, that the project overseer and Demolition Crew were both threatening to place liens on her property for nonpayment and that the project overseer was threatening to quit due to PNMAC's failure to issue payment as promised.

124. In a call with "Ricardo Vidal," a PNMAC employee, "Mr. Vidal" told Lawson that a December 26, 2018 notation on her account was from PNMAC's Main Office, approving her conceptual plan. The call with "Mr. Vidal" took place on January 2, 2019.

125. Upon Lawson's receipt of the singular check on December 28, 2018, "Ms. Dingle" had multiple private conversations with Buckeye Construction before insisting that Lawson had two options: (1) Endorse and hand the check over to the project overseer or (2) Return the check to PNMAC to be broken into three checks, in which case, all work on the rebuild would have to stop and Lawson's restricted escrow account containing Lawson's insurance proceeds would be frozen until the project overseer wrote a letter on letterhead stating she and Lawson had come to an agreement. Lawson left "Ms. Dingle" a voicemail on the same day to stop speaking in private with her project overseer, because it was only agitating the project overseer further. It is noteworthy that all of this occurred after PNMAC had been informed that Lawson was already afraid of the project overseer, her threats, and the gun she kept in her truck. Also noteworthy is that the harassment from the project overseer continued, because she was "tired of being jerked around."

126. On or about January 4, 2019, "Ms. Edwards" called Lawson. Lawson shared with "Ms. Edwards" the exciting news that her conceptual plan had been approved. "Ms. Edwards" then put Lawson in an impossible situation. She told Lawson that the conceptual plan was denied again; that "Mr. Vidal" was mistaken about the Main Office's approval; that she must obtain blueprints of the rebuild; that the blueprints must come from an Architect; and now the blueprints must also be approved by the City of Fairview, Tennessee before PNMAC would provide any consideration or feedback as to whether the blueprints were sufficient. "Ms. Edwards" behaved apathetically to the high-risk situation Lawson said she was being put in.

127. The City of Fairview, Tennessee does not and did not require blueprints for building at Lawson's rural property.

128. The same day, January 4, 2019, Lawson sent a second written request for PNMAC to provide a list of required documents beyond that of PNMAC's Claim Loss Packet, because PNMAC was requiring blueprints.

129. On or about January 11, 2019, Lawson called PNMAC and spoke with "Alise Hawkins." Lawson asked "Ms, Hawkins" to notate her account that Lawson still needed a written list of required items to avoid being blindsided again.

130. On or about January 14, 2019, "Ms. Edwards" from PNMAC called Lawson and told her that PNMAC will not give Lawson a list of required documents to help prevent her from being taken off-guard again.

131. On or about January 24, 2019, Lawson called the Williamson County Sherriff's Office about what PNMAC was doing. A John Doe investigator returned Lawson's call the same day.

After Lawson tried to explain what PNNMC was doing, the investigator was confused. He said Lawson is under a construction loan and underwater. Lawson didn't understand why he thought that and asked if it meant that it was PNMAC's prerogative to prevent Lawson from rebuilding. The investigator said that he didn't understand the question.

132. On Valentine's Day 2019, "Ms. Dingle" reiterated "Ms. Edwards" claim that PNMAC is unable to review any architectural plans not first approved by the City of Fairview, Tennessee and that PNMAC refuses to give criteria against which to compare for making this determination.

133. But for PNMAC's nonperformance and resulting misapplication of Lawson's November 2018 through January 2019 mortgage payments, Lawson would not have overpaid PNMAC approximately $2,993.44 during that time period. See Table 4 for a summation of damages resulting from breaches of contract while PNMAC was Lawson's Lender.

134. But for PNMAC's nonperformance and misrepresentation of Lawson's home loan being paid for in full, Lawson would not have overpaid PNMAC approximately $12,862.45 for February through October 2019 during that time period. Id.

135. On or about May 22, 2019, Angelo Marchese, Vice President of Loan Services for PNMAC and Rachel Madrid, also a PNMAC employee, called Lawson. Mr. Marchese instructed Ms. Madrid, "Anything we have the right paperwork for, get that out right away." This was the first day that Lawson had truly been given verbal approval to break ground and rebuild, giving Lawson only six months in which to rebuild. This appallingly belated verbal approval was given for a draft of blueprints for a home having 650 fewer square feet than Lawson's original home, a front door that opens into a bedroom (labeled Office because it had no

closet), and a grinder that the Architect placed in a closet. To Lawson's knowledge, grinders go in the yard and are connected to the septic tank.

136. A check dated May 22, 2019 was made out solely to Lawson in the amount of $15,501.20 for Lawson to break ground with her rebuild. (emphasis added) It was mailed to Lawson from PNMAC. It was also uploaded to Lawson's online PNMAC account, along with a letter dated May 24, 2019, that read, "We're sorry to hear about the damage to your home. We hope you are able to quickly restore your home. You recently reported an insurance claim to our Loss Drafts department. We are writing to acknowledge receipt of the insurance claim check associated with that claim.... Enclosed is a check which represents the initial disbursement of your claim funds for the repairs to your home." At no point was there a written agreement to rebuild, and Lawson still didn't know the truth about her Lender's broken obligations.

137. May 24, 2019 was too late for rebuilding Lawson's home, even if she had been a professional production Builder.

138. PNMAC spoiled Lawson's opportunity to obtain the additional, necessary proceeds when it took 190 days before allowing her to rebuild (11/14/2018-5/24/2019).

139. This check was issued six months after Lawson initiated her rebuild with PNMAC and six months before her deadline to rebuild 80% of her home in order for Lawson to qualify for an additional and imperative 20% of insurance proceeds. Lawson's discussions with experienced Builders and research on the matter indicated that six months for building a custom home as one's own Builder was simply infeasible. Because Lawson was incapable of

rebuilding her home, she mailed the three PNMAC checks back to Rachel Madrid on July 4, 2019.

140. Lawson made mortgage payments to PNMAC from November 2018 through October 2019.

141. By October 2019, aside from financial losses, being diagnosed with hypertension and diastolic dysfunction, and constant stress inflicted by PNMAC, Lawson had already been having symptoms similar to Early Onset Alzheimer's ("EOA") for several months. Lawson had required medical care so much in 2019 that, for the first time ever, she met her deductible and began receiving healthcare for free, so she took that opportunity to get to the root of her symptoms.

142. Lawson's primary physician agreed that something was wrong when she saw him in October 2019. He referred Lawson to a Neurologist, Dr. Ronald Wilson. Dr. Wilson diagnosed Lawson with amnesia on October 22, 2019 and recommended a brain MRI to determine the cause.

143. Based on Lawson's symptoms immolating EOA, Lawson was terrified. She believed that her life had been abbreviated. Accordingly, she began focusing on making plans for life insurance, permanent disability, assisted suicide, and where she might have to move to facilitate that assisted suicide, This is best shown via an audio recording Lawson made on October 27, 2019, previously submitted to this Honorable Court on December 6, 2021. See Receipt of Manual Filing (flash drive of "3 audio exhibits") at ECF Doc. No. 53.

144. Lawson's brain MRI on October 31, 2019 eliminated physical causes of Lawson's symptoms. Though difficult to trust and believe at the time, Lawson was assured by her relieved Neurologist that her symptoms were not organic.

145. Dr. Wilson recommended neuropsychological testing. On or about December 2-3, 2019, Lawson took a battery of eight exams with Neuropsychologist Dr. Cathy Della Mora.

146. On November 18, 2019, Lawson called PNMAC and spoke with "Arthur." After Lawson explained the impact of her health on her ability to bring in enough pay to cover her November 2019 mortgage payment and that her home had burned down a while back, "Arthur" performed a Financial Interview by phone. After the Financial Interview, "Arthur" said that it looked like Lawson qualified for a loan modification.

147. On or about November 20, 2019, Lawson called PNMAC and spoke with "Brenda." "Brenda" instructed Lawson to include a letter with her loan modification application with the housefire being the reason Lawson was not living at her property.

148. On or about November 22, 2019, Lawson uploaded 127-page application for a loan modification to her online PNMAC account, including a cover letter explaining that the Property was no longer her primary residence due to the housefire and roadblocks encountered by PNMAC for rebuilding.

149. On or about November 25, 2019, Lawson called PNMAC and spoke with "Elvis." Elvis explained to Lawson that she was protected from foreclosure while her application was being processed.

150. On or about December 10, 2019, Lawson called PNMAC because she learned that her loan modification application had been denied. She spoke with "Eric," who said he'd submit a request to the Research Department. He said that the Research Department would submit Lawson's loan modification application to FHA who would let PNMAC know if Lawson could have a loan modification because of her circumstances. Eric claimed to have logged these

and other details in Lawson's PNMAC file and that he would have documentation sent to Lawson that this was the status of her loan modification application.

151.   On or about December 11, 2019, while researching options to remedy a mortgage loan issue online before work, Lawson realized that the Defendants had breached the contract back when the fire happened. After having worn earbuds every possible working moment to avoid exposing her current disability, Lawson stood up from her office desk and asked every colleague around her if they understood the Lender's obligation in the same way she did. After much consideration and searching online, her colleagues concluded that, yes, Lawson's contract had been breached. Lawson began sobbing and had to be physically held by Jessie Smotherman, a colleague of Lawson's. This was the moment Lawson realized that the hell she had been through since the fire never should have been. She would eventually unravel that the breach of contract meant that PNMAC had continued collecting a mortgage from her for nearly a year after her home was and should have been considered paid in full. (emphasis added)

152.   That same day, December 11, 2019, was the day that Lawson realized: g. Her terror regarding her health had been no accident. h. Her inability to regain shelter that she had been paying for all along and tried so zealously to obtain wasn't bad luck. i. The loss of Lawson's opportunity to obtain another 20% additional insurance proceeds wasn't misfortune or fate. j. The circumstances affecting Lawson's health never should have been. k. And being faced with foreclosure was not a consequence of Lawson's own inadequacy. l. Much of Lawson's terror turned to anger. m. Lawson sent her first of multiple letters to

PNMAC demanding they remedy the initial breach of contract by applying her insurance proceeds retroactively.

153. Also on December 11, 2019, Lawson called PNMAC and spoke with "Jeff." After he spoke directly with "Eric," "Jeff" confirmed that "Eric" had not logged any notes to Lawson's PNMAC file, despite his assurance that he had. Nor had he done anything with Lawson's loan modification application, despite his assurances that he had.

154. "Eric," employee at PNMAC, called Lawson on December 13, 2019. When Lawson returned his call the same day, "Eric" asked Lawson if she wanted a Short Sale. Lawson did not know what that was but explained the breach of contract, mistreatment (including by "Eric"), and pending Buyer.

155. "Eric" also informed Lawson during the same call on December 13, 2019 that upper management, including the following PNMAC employees were working together on Lawson's mortgage loan: a. "Raquel" in the Insurance Department b. "Chris" in the Loss Mitigation Department c. "Carlos," who was "Eric's" supervisor, in the Loan Modification Department d. "Richard" in the Sales/Loan Servicing Department.

156. Although Lawson's loan modification application had previously been denied three times because the Property was not her primary residence (on or about November 29, 2019, December 18, 2019, and December 20, 2019), Lawson received a PNMAC notice from "Beatriz Hurtado," dated January 3, 2020. The notice stated,

157. "I am pleased to advise that I have been assigned to be your new point of contact throughout the Modification process…. As your point of contact, I will be responsible for the following: Communicating with you about the status of your loan as it goes through the

modification process; Advising you of any requirements for additional documentation that we may need to complete our evaluation of your loan for a modification; .... There is no action for you to take right now...."

158. On or about January 14, 2020, Lawson called PNMAC and her call was automatically routed to "Escalations," where "Stephanie" answered and explained that Lawson needed to speak with the Loss Draft Department, because they are the ones that should have applied Lawson's insurance proceeds to her loan balance.

159. Once "Stephanie" transferred the same January 14, 2020 call to PNMAC's Loss Draft Department, Lawson was informed by "Michelle" that only $158,688.85 remained of Lawson's insurance proceeds in her restricted escrow account, which is $42,343.17 less than what should have displayed on "Michelle's" computer screen. "Michelle" stated that she could not see where Lawson had returned three checks totaling $42,343.17. Eventually during the call, "Michelle" said that "Ms. Edwards" has a slightly different system; that "Ms. Edwards" can see more than "Michelle;" and that "Ms. Edwards" wanted to speak with Lawson about it. Lawson attempted to contact "Ms. Edwards" and "Ms. Dingle" six times over seven days before she was finally able to connect with ""Ms. Edwards"," at which time "Ms. Edwards" alleged that "Michelle" was looking at "Financials," claiming it to be a different, manually updated system. This is the same thing as saying that a bank has multiple sources of truth, independent of each other, thereby having to update Borrower data in more than one location. "Ms. Edwards" said that she would send a note to the Processing Team to update Lawson's restricted escrow balance to reflect the additional $42,343.17 that should have already been there.

160. On or about March 17, 2020, Lawson found a notice that had been uploaded to her online PNMAC account on the day after "Ms. Rengstorf" misapplied Lawson's insurance proceeds, February 4, 2020. The notice stated that PNMAC had sold Lawson's mortgage loan to MassMutual c/o Barings, effective February 3, 2020. Lawson never received the letter by mail.

161. But for PNMAC's nonperformance and misapplication of Lawson's insurance proceeds, Lawson would not have lost approximately $3,816.94 on February 3, 2020.

162. PNMAC mailed a notice, dated February 6, 2020, to accelerate Lawson's mortgage loan. As previously mentioned, the last communication Lawson received regarding her loan modification application was the January 3, 2020 letter from "Ms. Hurtado," introducing herself to Lawson as Lawson's point of contact throughout the modification process and informing Lawson that no action was needed by Lawson.

163. Dr. Della Mora's neuropsychological evaluation was mailed to Lawson on February 10, 2020, stated that Lawson had "markedly heightened physical health symptoms and concerns with features often associated with conversion disorders...." Measurements for assessing the accuracy of Lawson's current level of functioning were normal. Conversion disorder is a body's response to a perceived threat, normally caused by extreme stress or emotional trauma. Dr. Della Mora recommended several treatments in line with this. "Ms. Rengstorf" wrote a letter to Lawson, dated February 19, 2020, stating that she had applied Lawson's remaining insurance proceeds, $201,132.02, per Lawson's request. This is patently false.

164. The same letter, dated February 19, 2020, also stated that PNMAC declined Lawson's demand to remedy the breach by applying the proceeds retroactively.

165. On or about March 18, 2020, within 24 hours of Lawson finding the uploaded notice of sale to MassMutual c/o Barings, Lawson emailed "Ms. Rengstorf" asking about the sale.

166. Though Lawson never received a reply to the email, on March 19, 2020, within 24 hours of Mass Mutual and Barings attorneys and investigators being blind copied on an email inquiry from Lawson to PNMAC, PNMAC purchased Lawson's mortgage loan back from MassMutual c/o Barings.

167. On or about March 25, 2020, a Buyer purchased the Property for $60,000.00, finally prompting PNMAC to release Lawson's Deed, fourteen months after Lawson paid off her mortgage loan.

168. But for losing her opportunity to rebuild, being unable to convince PNMAC to remedy their breach of contract, and facing more alleged mortgage payments, Lawson would not have sold her vacant lot; nor would PNMAC have had the opportunity to keep another $30,577.29 of Lawson's insurance proceeds at the time of sale.

169. On or about May 14, 2020, PNMAC's outside counsel, Elizabeth Campbell, sent a letter of response to Lawson's demand for a remedy to the breach of contract. The letter declined to remedy the breach and denied the need to respond to Lawson's demand.

170. PNMAC admits that June 2020, which is one week after the date Rachel Madrid, a PNMAC employee, delivered the first insurance proceeds to break ground for the rebuild.

171. On or about April 4, 2021, in a last-ditch effort to work with the Defendants, Lawson filed a formal complaint with the Consumer Financial Protection Bureau.

172. On or about April 23, 2021, PNMAC declined again to remedy their breach of contract by simply calling the complaint a duplicate of this civil action.

173. On or about June 8, 2021, SWBC also declined to remedy their breach of contract by simply calling the complaint a duplicate of this civil action.

174. As described in this action, SWBC and PNMAC each implied through written and verbal correspondence and through omissions that rebuilding Lawson's home should occur through her existing Lender. Neither SWBC, nor PNMAC, ever corrected Lawson's blatantly obvious belief that a rebuild must occur through her current Lender. Nor did either of them ever tell Lawson that her rebuild did not have to occur through her current Lender.

175. Despite Lawson telling miscellaneous PNMAC employees, verbally and in writing, over a dozen times beginning in November 2018 that she had one year in which to build 80% of her home if she was to qualify for any more proceeds, PNMAC chose to hinder The Rebuild with nineteen denials in lieu of explaining or admitting their obligations. PNMAC successfully prevented Lawson's ability to access approximately $40,000 in additional, imperative insurance proceeds.

Case 3:21-cv-00197   Document 77   Filed 01/06/23   Page 43 of 65 PageID #: 1183

Table 1: Timeline of Primary Events Regarding Breach of Contract *Before* Health Impacts Began

| Oct 1, 2016 | Nov 29, 2017 | Dec 21, 2017 | Dec 27, 2017 | Jan 11, 2018 | Oct 16, 2018 | Nov 2, 2018 | Nov 12, 2018 | Nov 14 & 27, 2018 |
|---|---|---|---|---|---|---|---|---|
| Express agreement was made between Lawson & SWBC | Housefire at ~4am. By ~8am, the Adjuster deemed Lawson's home a total loss. | 1) SWBC sent Lawson an allegedly comprehensive packet of instructions for processing her claim. 2) Lawson overnighted endorsed $218,400 settlement check to SWBC. | "Charity" at SWBC claims SWBC received Lawson's letter of intent to rebuild on this date, which SWBC had instructed Lawson to send. | Adjuster's Worksheet (replacement value) from the Adjuster successfully faxed to "Kay" at SWBC. | Notice of Servicing Transfer from SWBC to PNMAC; no change in agreement. | SWBC sold Lawson's home loan to PNMAC | PNMAC sent Lawson an allegedly comprehensive packet of instructions for processing her claim. | Lawson sent PNMAC a letter informing them that she intended to rebuild her home. |

〜〜〜 The broken line in the timeline above represents duration of Lawson's divorce proceedings, during which time she did not know if she or her ex-wife would end up owning the Property.

Case No. 3:21-CV-197

**Table 2: Timeline of Primary Events Regarding Breach of Contract *Including* Most Severe Impact to Health**

| Jan 31, 2019 | Dec 11, 2019 | Jan 25, 2020 | Jan 31, 2020 | Feb 5, 2020 | Feb 19, 2020 | Mar 25-27, 2020 | May 14, 2020 | Monday, Feb 1, 2021 | Apr 23, 2021 | Jun 8, 2021 |
|---|---|---|---|---|---|---|---|---|---|---|
| If Uniform Covenant #5 of the Contract had been acted on by either Defendant Lawson's home loan would have been paid in full. | Lawson realized at least one of the Defendants had breached the contract | "Crystal" said, "[The note] says that you didn't receive enough claim funds to repair your home." | PNMAC applied remainder of Lawson's Settlement (~$201K) to Lawson's home loan, claiming Lawson requested this action. Actually, Lawson told Ms. Rengstorf not to do so 10 times. | Ms. Rengstorf called Lawson and verified the misapplication of Lawson's Settlement. | Ms. Rengstorf declined to remedy breach of contract in writing. | 1) Lawson sold her property under duress. 2) PNMAC took ~$30K from sale for what they claimed paid off Lawson's home loan. | PNMAC's counsel declined demand to remedy breach or even the need to respond to Lawson's demand. | Complaint Filed with William-son County Chancery Court | PNMAC declined to remedy breaches via Lawson's 4/6 consumer complaint. | SWBC declined to remedy breaches via Lawson's 4/6 consumer complaint. |

- - - The broken line in the timeline above represents the minimum duration which Lawson's health and well-being were severely impacted by her experiences with PNMAC.

**Table 3: Damages from Breaches of Contract While SWBC Was Lawson's Lender**

| DESCRIPTION | DATES | LOAN BALANCE IF UNIFORM COVENANT #5 HAD BEEN PERFORMED BY LENDER | AMOUNT THAT LENDER SHOULD HAVE APPLIED TO PRINCIPAL BALANCE | LENDER ACTUALLY APPLIED AS PRINCIPAL | AMOUNT OF DAMAGES INCURRED FROM OVERALL EXCESS PAYMENTS | AMOUNT OF DAMAGES INCURRED |
|---|---|---|---|---|---|---|
| *LOAN DETAIL AT END OF 2017 (1 MONTH AFTER HOUSEFIRE)* | 2016-2017 | $236,416.84 | $4,145.16 | $4,145.16 | $0.00 | $0.00 |
| *SWBC IN POSSESSION OF SETTLEMENT & ADJUSTER's WORKSHEET SHOW PROCEEDS TO BE INSUFFICIENT* | January 11, 2018: SWBC's Nonperformance | $18,016.84 | $218,400.00 | N/A | N/A | N/A |
| | 1/2018 | $16,575.22 | $1,441.62 | $353.20 | $1,088.42 | |
| | 2/2018 | $15,133.60 | $1,441.62 | $354.41 | $1,087.21 | |
| | 3/2018 | $13,786.82 | $1,346.78 | $355.63 | $991.15 | |
| | 4/2018 | $12,422.98 | $1,363.84 | $356.85 | $1,006.99 | |
| *MONTHLY MORTGAGE PAYMENTS MADE* | 5/2018 | $11,055.26 | $1,367.72 | $358.08 | $1,009.64 | $10,335.98 |
| | 6/2018 | $9,683.64 | $1,371.62 | $359.31 | $1,012.31 | |
| | 7/2018 | $8,304.18 | $1,379.46 | $360.54 | $1,018.92 | |
| | 8/2018 | $6,924.72 | $1,379.46 | $361.73 | $1,017.73 | |
| | 9/2018 | $5,545.26 | $1,379.46 | $363.03 | $1,016.43 | |
| | 10/2018 | $4,093.80 | $1,451.46 | $364.28 | $1,087.18 | |

Case 3:21-cv-00197   Document 77   Filed 01/06/23   Page 46 of 65 PageID #: 1186

**Table 4: Damages from Breaches of Contract While PNMAC Was Lawson's Lender**

| DESCRIPTION | DATES | LOAN BALANCE IF UNIFORM COVENANT #5 HAD BEEN PERFORMED BY LENDER | AMOUNT THAT LENDER SHOULD HAVE APPLIED TO PRINCIPAL BALANCE | LENDER ACTUALLY APPLIED AS PRINCIPAL | AMOUNT OF DAMAGES INCURRED FROM OVERALL EXCESS PAYMENTS | AMOUNT OF DAMAGES INCURRED |
|---|---|---|---|---|---|---|
| 1) MONTHLY MORTGAGE PAYMENT MADE THIS MONTH AND 2) PNMAC's FIRST NONPERFORMANCE | November 2, 2018 | $2,642.34 | $1,451.46 | $365.53 | $1,085.93 | |
| MONTHLY MORTGAGE PAYMENT MADE | December 2018 | $1,190.88 | $1,451.46 | $366.78 | $1,084.68 | $2,993.44 |
| 1) MONTHLY MORTGAGE PAYMENT MADE, AND 2) APPROXIMATE DATE LAWSON'S NOTE WAS PAID IN FULL, 3) DATE OF LAWSON'S CRISIS HYPERTENSION WHILE ON A 2-HOUR PHONE CALL WITH PNMAC, AND 4) DATE OF LAWSON'S FIRST HYPERTENSION ISSUE EVER. | January 31, 2019 | $0.00 | $1,190.88 | $368.05 | $822.83 | |
| PRINCIPAL BALANCE WAS $0.00 ACCORDING TO DOT'S UNIFORM COVENANT #5, BUT LAWSON DID NOT KNOW ABOUT BREACH AND CONTINUED MAKING PAYMENTS THAT PNMAC SAID WERE DUE AND ACCEPTED UPON RECEIPT. | 2/2019 | $0.00 | $0.00 | $369.31 | $1,452.21 | $12,862.45 |
| | 3/2019 | $0.00 | $0.00 | $370.58 | $1,426.28 | |
| | 4/2019 | $0.00 | $0.00 | $371.85 | $1,426.28 | |
| | 5/2019 | $0.00 | $0.00 | $373.13 | $1,426.28 | |
| | 6/2019 | $0.00 | $0.00 | $374.41 | $1,426.28 | |
| | 7/2019 | $0.00 | $0.00 | $375.70 | $1,426.28 | |
| | 8/2019 | $0.00 | $0.00 | $376.99 | $1,426.28 | |
| | 9/2019 | $0.00 | $0.00 | $378.29 | $1,426.28 | |
| | 10/2019 | $0.00 | $0.00 | $379.59 | $1,426.28 | |

Case 3:21-cv-00197   Document 77   Filed 01/06/23   Page 47 of 65 PageID #: 1187

| DESCRIPTION | DATES | LOAN BALANCE IF UNIFORM COVENANT #5 HAD BEEN PERFORMED BY LENDER | AMOUNT THAT LENDER SHOULD HAVE APPLIED TO PRINCIPAL BALANCE | LENDER ACTUALLY APPLIED AS PRINCIPAL | AMOUNT OF DAMAGES INCURRED FROM OVERALL EXCESS PAYMENTS | AMOUNT OF DAMAGES INCURRED |
|---|---|---|---|---|---|---|
| PNMAC DENIED REMEDY FOR BREACH OF Contract AND INSTEAD MISAPPLIED SETTLEMENT TO BALANCE OF HOME LOAN WITH A CURRENT EFFECTIVE DATE (NOT RETROACTIVE) WHILE ALLEGING LAWSON REQUESTED THIS ACTION. | January 31, 2020 (2 years, 2 months, and 2 days after Lawson's home burned down) | $0.00 | N/A | $201,132.02 | N/A | N/A |
| AMOUNT OF LAWSON'S SETTLEMENT PNMAC APPLIED AS MORTGAGE PAYMENTS THEY ALLEGED WERE DUE | February 3, 2020 | $0.00 | $0.00 | $1,542.01 | $3,816.94 | $3,816.94 |
| AMOUNT OF SALE PROCEEDS OF DEMOLISHED, VACANT LOT TAKEN BY PNMAC, AT WHICH TIME, THE MAXIMUM ALLOWABLE PRINCIPAL WAS EXCEEDED IN ADDITION TO MORE INTEREST PAYMENTS THAT SHOULDN'T HAVE EXISTED. | March 25, 2020 | $0.00 | $0.00 | $30,577.29 | $30,577.29 | $30,577.29 |

## VI. Causes of Action

These causes of action relate back to the initial Complaint because they assert claims that arose out of the conduct, transaction, or occurrence set out – or attempted to be set out – in the original pleading.

### A. *SWBC Mortgage Corp. breached the Contract.*

177. Lawson incorporates by reference the allegations in paragraphs 1-175 of this Amended Complaint.

178. All breach of contract counts occurred after January 31, 2016, so these claims are filed timely.

179. The parties do not question the existence of the Contract.

180. Count One: SWBC breached Uniform Covenant Five of the Deed of Trust when, with knowledge of the Rebuild's economic infeasibility, it failed to perform the obligation of applying the Settlement to the sums owed on the Loan, whether or not then due.

181. Counts Two through Twelve: SWBC breached Uniform Covenant Two of the Deed of Trust each time they misapplied Lawson's mortgage payments predominantly to incorrect interest

182. $10,335.98 in Lawson's damages flow from this breach of contract. But for SWBC's breach of their covenant and agreement to apply Lawson's insurance proceeds to the balance of her loan, given her insurance proceeds were insufficient for covering the rebuild of her home, Lawson would not have paid SWBC an excess of approximately $10,335.98 in

mortgage loan payments between January and October of 2018. See Table 3 in this Amended Complaint for a summation of these damages.

**B. PennyMac Loan Services, LLC breached the Contract.**

183. Lawson incorporates by reference the allegations in paragraphs 1-182 of this Amended Complaint.

184. All breach of contract counts occurred after January 31, 2016, so these claims are filed timely.

185. Count One: PNMAC breached Uniform Covenant Five of the Contract when, with knowledge of the Rebuild's economic infeasibility, it failed to perform the obligation of applying the Settlement to the sums owed on the Loan upon Transfer of Service to PNMAC with the date the Rebuild became economically infeasible.

186. Counts Two-Four: Jane or John Does at PNMAC breached Uniform Covenant Two of the Contract each time they misapplied Lawson's mortgage payments predominantly to incorrect interest. Counts Five-Thirteen: PNMAC breached Uniform Covenant Three of the Contract each time it kept Lawson's mortgage payments that exceeded her maximum principal indebtedness of $240,562.00.

187. Count Fourteen: Knowing Lawson was too ill to fight it, Ms. Rengstorf breached the Uniform Covenant in Section Three of the Contract again when she took sums from Lawson's Settlement that exceeded Lawson's maximum principal indebtedness of $240,562.00. This occurred on January 31, 2020, so filing this claim on Monday, February 1, 2021 was timely.

## VI. Causes of Action

These causes of action relate back to the initial Complaint because they assert claims that arose out of the conduct, transaction, or occurrence set out – or attempted to be set out – in the original pleading.

### A. *SWBC Mortgage Corp. breached the Contract.*

185. Lawson incorporates by reference the allegations in paragraphs 1-184 of this Amended Complaint.

186. All breach of contract counts occurred after January 31, 2016, so these claims are filed timely.

187. The parties do not question the existence of the Contract.

188. Count One: SWBC breached Uniform Covenant Five of the Deed of Trust when, with knowledge of the Rebuild's economic infeasibility, it failed to perform the obligation of applying the Settlement to the sums owed on the Loan, whether or not then due.

189. Counts Two through Twelve: SWBC breached Uniform Covenant Two of the Deed of Trust each time they misapplied Lawson's mortgage payments predominantly to incorrect interest

190. $10,335.98 in Lawson's damages flow from this breach of contract. But for SWBC's breach of their covenant and agreement to apply Lawson's insurance proceeds to the balance of her loan, given her insurance proceeds were insufficient for covering the rebuild of her home, Lawson would not have paid SWBC an excess of approximately $10,335.98 in

mortgage loan payments between January and October of 2018. See Table 3 in this Amended Complaint for a summation of these damages.

### B. PennyMac Loan Services, LLC breached the Contract.

191. Lawson incorporates by reference the allegations in paragraphs 1-190 of this Amended Complaint.

192. All breach of contract counts occurred after January 31, 2016, so these claims are filed timely.

193. Count One: PNMAC breached Uniform Covenant Five of the Contract when, with knowledge of the Rebuild's economic infeasibility, it failed to perform the obligation of applying the Settlement to the sums owed on the Loan upon Transfer of Service to PNMAC with the date the Rebuild became economically infeasible.

194. Counts Two-Four: Jane or John Does at PNMAC breached Uniform Covenant Two of the Contract each time they misapplied Lawson's mortgage payments predominantly to incorrect interest. Counts Five-Thirteen: PNMAC breached Uniform Covenant Three of the Contract each time it kept Lawson's mortgage payments that exceeded her maximum principal indebtedness of $240,562.00.

195. Count Fourteen: Knowing Lawson was too ill to fight it, Ms. Rengstorf breached the Uniform Covenant in Section Three of the Contract again when she took sums from Lawson's Settlement that exceeded Lawson's maximum principal indebtedness of $240,562.00. This occurred on January 31, 2020, so filing this claim on Monday, February 1, 2021 was timely.

196. Several damages flow from these breaches of contract: incorrect interest paid, loss of additional proceeds, devaluation when selling the Property, an Architect's retainer fee, time lost, work put into attempts to cope with these breaches.

### C. PennyMac Loan Services, LLC breached its fiduciary duty.

197. Lawson incorporates by reference the allegations in paragraphs 1-196 of this Amended Complaint.

198. PNMAC and Lawson's relationship began via the Contract.

199. Lawson was inexperienced in all related insurance matters resulting from the housefire.

200. PNMAC and Lawson's contractual relationship evolved into a troubled legal or per se fiduciary relationship when PNMAC exercised control over Lawson.

201. In this confidential relationship, Lawson placed confidence in PNMAC. For example, Lawson sought and failed to obtain nineteen approvals from PNMAC for beginning the Rebuild. In this example, Lawson did not need any approval from PNMAC. She needed to be released from it. PNMAC exercised control over Lawson and Lawson was under PNMAC's control when PNMAC hindered the Rebuild, her ability to obtain additional proceeds, and demolished the value of the Property.

202. PNMAC, with ability and because of Lawson's confidence in it, influenced and exercised control over Lawson when it prevented the Rebuild.

203. Because Lawson and PNMAC both understood that Lawson did not know she could act independently of PNMAC, a special trust or confidence had been reposed. Lawson and PNMAC were well beyond conducting business at arm's-length. For example, Lawson acted

with full transparency and amiability with PNMAC. PNMAC, on the other hand, hid critical information from Lawson regarding the Rebuild and the Loan. PNMAC also acted against Lawson's interests to her detriment.

204. Lawson did not have a routine business relationship with PNMAC. Attempts to rebuild were regularly vetted and denied by PNMAC's Legal Team. Lawson's world revolved around PNMAC to regain her home because she was completely dependent on it. On or about December 21, 2018, Ms. Dingle spoke to Lawson about the trust she wanted to build with Lawson. The relationship between PNMAC and Lawson was fiduciary.

205. PNMAC had a duty to act and give advice for the benefit of Lawson on matters within the scope of the Deed of Trust.

206. Lawson clearly did not understand her rights and options with her Lenders.


### D. PennyMac Loan Services, LLC violated Tennessee's Consumer Protection laws.

207. Lawson incorporates by reference the allegations in paragraphs 1-206 of this Amended Complaint.

208. Count One: PNMAC represented that Lawson could rebuild in opposition to the terms of the Contract. Tenn. Code Ann. §47-18-104(b)(12).

209. Count Two: PNMAC represented that Lawson must rebuild. Tenn. Code Ann. §47-18-104(b)(13).

210. Count Three: PNMAC deceived Lawson with its Claim Loss Packet and obstruction to the Rebuild. Tenn. Code Ann. §47-18-104(a).

211. Count Four: PNMAC refused to fulfill its obligations and act within the scope of the terms of the Contract. Tenn. Code Ann. §47-18-104(c)(1).

212. Lawson incorporates by reference the allegations in paragraphs 1-# of this Amended Complaint.

213. PNMAC's misrepresentations, deception, and bogus acts affected trade or commerce, as defined by the Act.

214. A foreclosure, as defined by Oxford Languages, is the action of taking possession of a mortgaged property when the mortgagor fails to keep up their mortgage payments.

215. PNMAC's attempt to foreclose on the Property in February 2020 was illegitimate because there was no collateral to legally repossess.

216. The Loan was paid off in full per the terms of the Deed of Trust on January 31, 2019. PNMAC's notice of intent to accelerate was dated February 6, 2020, at which time, even PNMAC only considered a January payment as overdue. This is because Ms. Rengstorf applied the Settlement to three months of mortgage payments and fees they considered due before applying the remainder to Lawson's principal. From the start, the Rebuild was not economically feasible. Had PNMAC honored their obligation per Covenant 5 of the Deed of Trust, PNMAC could not have suggested Lawson owed anything after January 2019.

217. PNMAC's misrepresentation, deception, and bogus acts facilitated Lawson's losses associated with the misapplication of the Settlement, degraded value of the Settlement from sitting stagnant for years, and property value lost when Lawson had to sell the

Property. These losses resulted from the unfair and deceptive acts and practices described herein.

218. A reasonable Consumer would have likely been misled and harmed by PNMAC's material misrepresentations, practices, and omissions as described herein.

219. Lawson is a consumer as defined by the Act. Tenn. Code Ann. § 47-18-102(2).

220. PNMAC's acceleration of the Note more than a year after Lawson's mortgage loan was paid off in full per the terms of the Contract did not distance its conduct from trade and commerce, as defined by the Tennessee Consumer Protection Act.

221. The manufactured "foreclosure proceedings" of PNMAC after the Loan was paid in full were illegitimate and divorced from actions on the part of Lawson. (emphasis added) A lender's illicit actions do not constitute actual foreclosure, a valid reason for debt-collection, or an authentic need for a loan modification. Further, PNMAC's deception around foreclosure is peripheral to the heart of this complaint and occurs long after other illicit actions occurred.

222. The losses associated with the claim under the TCPA resulted from the unfair and deceptive acts described herein.


**E. PennyMac Loan Services, LLC committed insurance fraud and concealed its fraud. See TN Code § 56-53-103.**

223. Lawson incorporates by reference the allegations in paragraphs 1-221 of this Amended Complaint.

224. Lawson periodically suspected fraud as a general term. After reading PNMAC's second motion to dismiss, Lawson dissected each sentence. PNMAC mentioned a fiduciary relationship. When Lawson investigated this in conjunction with Tennessee Common Law, she realized that Tennessee has a specific common law for insurance fraud that applies to Defendants' conduct beyond their breaches of contract and introduces Insurance Fraud as the correct statute covering Defendants' fraudulent conduct.

225. PNMAC's services are partly compensated by insurance claims and proceeds, either directly or indirectly.

226. PNMAC committed an unlawful insurance act hoping to induce Lawson's dependence, when Ms. Edwards knowingly notated Lawson's mortgage account years late, purportedly on Lawson's behalf, for other insurance professionals in connection with Lawson's Settlement. The information notated had been true for the past two years. This falsely represented the timing of economic infeasibility for the Rebuild (a material fact). Further, PNMAC employees withheld and/or concealed its obligation regarding Lawson's Settlement, given the economic infeasibility of the Rebuild pursuant to the Policy.

227. PNMAC's infliction of fictitious obligations on Lawson after the fire altered their relationship from a simple Lender-Borrower relationship to one of fiduciary responsibility. PNMAC and Lawson had a fiduciary relationship.

228. PNMAC mishandled Lawson's insurance proceeds as servicer and owner of Lawson's mortgage loan.

229. When Ms. Rengstorf breached the contract by misapplying the Settlement, she also breached a common law duty independent of the Contract.

230. PNMAC had a separate and affirmative duty to disclose their breaches of contract and its intentional, erroneous transaction involving Lawson's Settlement, but it failed to do so. Lawson's damages stem from a breach of the Contract and Insurance Fraud.

231. Ten months after Lawson's Loan was paid off in full per the Contract, PNMAC was still representing otherwise. It applied $32,156.69 from the sale proceeds to pay off what it called the outstanding balance of Lawson's Loan. It paid $3,979 for realtor fees and closing costs that Lawson would not have had, had PNMAC's actions been legitimate. And it called the 90.3% loss of the value of the Property from Lawson's initial purchase a "profit."

232. PNMAC's actions affected its servicing of the Loan and the value of the Property.

233. Lawson said "No" ten times during a phone call with Ms. Rengstorf, employee at PNMAC, when repeatedly asked if Lawson wanted PNMAC apply her Settlement with a current effective date which was years after her home burned. Lawson even said it was fraud on the phone call. PNMAC misapplied the remaining Settlement anyway, which equaled $201,132.02, to the outstanding balance of the Loan, effective February 3, 2020. PNMAC then represented that Lawson requested they do so. In so doing, PNMAC acted unlawfully and outside the scope of servicing Lawson's Loan and outside its rights as afforded by the Contract.

234. These averments constitute a claim for Fraud.

235. Neither PNMAC's misleading packet of allegedly comprehensive instructions for processing a claim, nor its verbal instructions and requirements given to Lawson should have altered the terms of the Contract or governed the relationship with PNMAC and Lawson.

236. PNMAC's sending of a "Property Loss Claim Package" in November 2018 was insurance fraud; PNMAC's intentional misapplication of the Settlement to the Loan on or about January 31, 2020 was insurance fraud.

237. PNMAC actively chose to attempt a false foreclosure on Lawson's fully-paid-for property.

**F. PennyMac Loan Services, LLC committed insurance fraud when Ms. Rengstorf misapplied Lawson's remaining Settlement to the sums owed on Lawson's mortgage loan with a grossly inaccurate effective date.**

238. Lawson incorporates by reference the allegations in paragraphs 1-237 of this Amended Complaint.

239. PNMAC unlawfully, knowingly and with intent to defraud, and for the purpose of depriving Lawson of pecuniary gain, committed or intentionally permitted its employees or its agents to divert, misappropriate, convert or embezzle funds of Lawson's in connection with an insurance transaction.

240. PNMAC's act of misapplying the Settlement was false or fraudulent because it involved, at a minimum, "subterfuge" that Lawson's proceeds were to be erroneously applied to the balance of the Loan with a current effective date instead of applying it with an effective date that aligned with the housefire, the Contract, and Lawson's insurance claim.

241. PNMAC prepared, these false or fraudulent documents or writings.

242. PNMAC intended for these false or fraudulent documents or writings to be presented or used in support of the misapplication of Lawson's claim for the payment of her loss or other benefit.

243. PNMAC presented or caused to be presented false or fraudulent proof in support of Lawson's claim when paying down the sums owed on Lawson's principal loan with Lawson's Settlement with an effective date years after its obligation to do so.

244. Lawson's Settlement was derived from the Policy.

245. Lawson's has stated a Plausible Claim for Relief resulting from Insurance Fraud.

### G. PennyMac Loan Services, LLC committed fraud, declined a demand to perform according to the terms of the Contract, and concealed those actions.

246. Lawson incorporates by reference the allegations in paragraphs 1-245 of this Amended Complaint.

247. PNMAC concealed or suppressed a material fact.

248. PNMAC had an affirmative duty to disclose that fact to Lawson.

249. PNMAC intentionally concealed or suppressed that fact with the intent to deceive Lawson.

250. Lawson was unaware of the act and would have acted differently if she had known about the concealed fact. Lawson was damaged because of the concealment or suppression of the fact.

### H. PennyMac Loan Services, LLC intentionally inflicted Lawson's emotional distress.

251. Lawson incorporates by reference the allegations in paragraphs 1-250 of this Amended Complaint.

252. PNMAC's conduct described in this Amended Complaint was intentional or reckless.

253. PNMAC's intolerable conduct was outrageous and utterly lacking in civility.

254. PNMAC's conduct resulted in very serious mental injury to Lawson, most of which was temporary in nature.

255. The Complaint Sufficiently Pleads a Claim for Intentional Infliction of Emotional Distress.

256. Lawson's IIED claim is valid and should be granted.

257. Lawson contends she was harmed by the extreme, chronic and longstanding stress that PNMAC inflicted on her as she tried to regain her shelter.

258. But for PNMAC, Lawson would not have thought she had a terminal illness. But for PNMAC, Lawson would not have encountered chronic, relentless stress for months on end.

259. PNMAC's conduct was so outrageous, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.

260. What PNMAC put Lawson through, its collective actions, was horrid. It was savage, carnal and utterly lacking in humanity or civility.


**Considering the plausible claims asserted above, Lawson respectfully requests the following relief from this Honorable Court:**

a) That process issue and each Defendant be required to answer within the time allowed by law;

b) That Lawson be awarded compensatory damages against SWBC and PNMAC, jointly and severally, in an amount in excess of $480,000.00;

c) That Lawson be awarded punitive damages against SWBC and PNMAC, jointly and severally, in an amount to be set by the Trier of Fact in addition to and in excess of the amount of compensatory damages;

d) That Lawson be awarded treble damages against PNMAC, pursuant to the Tennessee Consumer Protection Act for the willful, knowing and intentional violations of the act.

e) That PNMAC be Ordered to correct Lawson's credit reporting with Transunion, Equifax, Innovis, and Experian.

f) That SWBC and PNMAC, jointly and severally, be Ordered to install guardrails that will prevent this harm from happening to other Borrowers going forward. These guardrails could be one or more of the follow ideas or ideas generated by the Trier of Fact during trial. Lawson's hope is that any guardrails be ordered to be implemented quickly with a definitive start date and some form of monitoring. Lawson's ideas are for SWBC and PNMAC to each:

    i. Provide known requirements in initial claim-related materials distributed to a Borrower and additional clear, unambiguous written correspondence to Borrowers as claim-related requirements become known.

    ii. Include clear, unambiguous terms for Settlement from a Borrower's Deed of Trust in any claim-related materials distributed to a Borrower.

    iii. Train and monitor PNMAC representatives to verbally explain and refer applicable Borrowers to the Section Five of a Borrower's Deed of Trust.

    iv. Create and maintain a single source of truth in all existing and new loan origination software platforms. A Borrower's financial data should never be entered in multiple locations.

    v. Include clear language in notifications of assignment, sale, or transfer that will perpetuate these protections when assigning, selling, or transferring a Borrower's

loan. Likewise, include clear language in notifications of assignment, sale, or transfer that will initiate these protections when a Borrower's home loan is assigned, sold, or transferred to SWBC or PNMAC.

      vi.   Continue these protections indefinitely, even beyond a Lender's affiliation change.

g) That Lawson be awarded her attorney fees, costs of litigation, and other expenses in prosecuting this civil action, plus pre- and post-judgement interest;

h) That a jury of six (6) be impaneled to hear this action;

i) That Lawson be awarded such other, further relief as this Honorable Court deems just and equitable.

j) For general relief.

Respectfully submitted this 22nd day of April, 2022.

Julie Ann Lawson, Plaintiff (pro se)
625 Harpeth Bend Drive; Nashville, TN 37221
Phone No: 615.294.6527
julie.lawson0207@gmail.com
~ Be a light, the change, & ever kind. ~

THIS COMPLAINT IS SET TO BE HEARD ON _____ AT _____ O'CLOCK A.M./P.M. ON THE CIRCUIT CIVIL COURT COMPLAINT DOCKET HEARD AT THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF TENNESSEE, NASHVILLE DIVISION. IF NO WRITTEN RESPONSE TO THIS COMPLAINT IS FILED AND SERVED IN THE TIME SET BY THIS HONORABLE COURT, THE COMPLAINT MAY BE GRANTED WITHOUT A HEARING.

## CERTIFICATE OF SERVICE

I hereby certify that I personally served a true and exact copy of the foregoing AMENDED COMPLAINT with the Clerk of Court for THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF TENNESSEE, NASHVILLE DIVISION and that I served a true and exact copy of the same upon the individuals listed below via first class U.S. mail on this the 22nd day of April, 2022:

*Attorneys for Defendant SWBC Mortgage Corp.:*

Mark M. Bell (BPR #029048, mark.bell@wallerlaw.com, 615.850.8850) &
David J. Zeitlin (BPR# 037664, david.zeitlin@wallerlaw.com, 615.244.6380),
Waller, Lansden, Dortch & Davis, LLP
Nashville City Center, 511 Union Street, Suite 2700; Nashville, TN 37219

*Attorneys for Defendant PennyMac Loan Services, LLC:*

Melody McAnally, BPR #25971
Butler Snow, LLP
6075 Poplar Avenue, Suite 500; Memphis, TN 38119
Phone: 901.680.7200
melody.mcanally@butlersnow.com

Elizabeth J. Campbell (pro hac vice), Georgia Bar #349249
Locke Lord, LLP
Terminus 200, Suite 1200; 3333 Piedmont Road NE; Atlanta, GA 30305
Phone: 404.870.4600
ecampbell@lockelord.com

Julie Lawson, Plaintiff (pro se)
625 Harpeth Bend Drive; Nashville, TN 37221
Phone: 615.294.6527
julie.lawson0207@gmail.com