# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### AT NASHVILLE

JULIE LAWSON               )
                                )      **Case No. 3:21-cv-00197**
v.                        )
                                )
SWBC MORTGAGE CORP.,       )
PENNYMAC LOAN SERVICES, LLC   )

**To: The Honorable Aleta A. Trauger, United States District Judge**

## REPORT AND RECOMMENDATION

By order entered March 12, 2021, the Court referred the above captioned *pro se* civil case to the Magistrate Judge for pretrial matters under 28 U.S.C. §§ 636(b)(1)(A) and (B), Rule 72 of the Federal Rules of Civil Procedure, and the Local Rules of the Court. (Docket No. 5.)

Presently pending before the Court are two motions to dismiss Plaintiff Julie Lawson's fourth amended complaint, one filed by Defendant PennyMac Loan Services, LLC ("PennyMac") (Docket No. 103) and the other filed by Defendant SWBC Mortgage Corp. ("SWBC") (Docket No. 105). Plaintiff responded in opposition to both motions. (Docket No. 110.) PennyMac and SWBC separately replied in support of their motions. (Docket Nos. 111, 112.)

For the reasons set out below, the undersigned respectfully recommends that PennyMac's motion to dismiss (Docket No. 103) be GRANTED IN PART AND DENIED IN PART and that SWBC's motion to dismiss (Docket No. 105) be DENIED.

# I.     BACKGROUND

## A.     Procedural Background

Plaintiff Julie Lawson filed this lawsuit *pro se* on February 1, 2021 in the Circuit Court for Williamson County, Tennessee against Defendants PennyMac and SWBC.[1] (Docket No. 1-1.) Plaintiff filed an Amended Complaint on March 2, 2021. (Docket No. 1-2). PennyMac removed the lawsuit to this Court on March 10, 2021, to which SWBC consented. (*Id.*)

Following removal to this Court, Plaintiff amended her complaint several times in response to motions to dismiss filed by PennyMac and SWBC. To start, PennyMac and SWBC moved to dismiss Plaintiff's amended complaint that had initially been filed in state court. (Docket Nos. 13, 20.) In response, Plaintiff moved for leave to amend (Docket No. 51), which the Court granted (Docket No. 59). Plaintiff then filed her second amended complaint, which she titled "Twice Amended Complaint for Breach of Contract, Violation of Tennessee's Consumer Protection Laws, Fraud, Fraudulent Concealment, and Intentional Infliction of Emotional Distress" (Docket No. 61), and which PennyMac and SWBC moved to dismiss (Docket Nos. 65, 68). Again in response, Plaintiff moved for leave to amend (Docket No. 71), which the Court granted (Docket No. 76). Plaintiff then filed her third amended complaint, which she titled "Amended Complaint" (Docket No. 77), and which PennyMac and SWBC once more moved to dismiss (Docket Nos. 78, 80). Again in response, Plaintiff moved for leave to amend (Docket No. 91), which the Court granted (Docket No. 96). However, the Court informed Plaintiff that she would not be given another

---

[1] Plaintiff initially filed claims against Angelo Marchese, who she identified as the "Vice President" of PennyMac. (Docket No. 1-2 at ¶ 4.) However, Plaintiff omitted her claims against Mr. Marchese in her "Twice Amended Complaint," so Mr. Marchese is no longer a defendant in or party to this litigation. (Docket No. 61.)

opportunity to amend her complaint, and would, instead, be required to respond to any motions to dismiss that might be filed by PennyMac and SWBC. (*Id.*)

In response, Plaintiff filed her fourth amended complaint, which she titled "Fourth Amended Complaint" (Docket No. 97), and which, not surprisingly, PennyMac and SWBC have moved to dismiss (Docket Nos. 103, 105). This fourth amended complaint – which spans 72 pages and includes 181 paragraphs, many of which have several subparagraphs[2] – and the defendants' most recent motions to dismiss are the only ones at issue in this report and recommendation.

## B. Factual Background

In the operative fourth amended complaint, Plaintiff alleges that SWBC originated a mortgage loan to Plaintiff for real property located at 7456 Sleepy Hollow Road, Fairview, Williamson County, Tennessee 37062 (the "Property") in the principal sum of $240,562.00 with a fixed interest rate of 4.125% over a 360-month period (the "Loan"). (Docket No. 97 at ¶¶ 1–2, 8, 10–11, 18.) SWBC issued a Deed of Trust for the Property, which was recorded on October 5, 2016.[3] (Docket No. 61-1 at 2–12.)

Unfortunately, a little over a year later, on November 29, 2017, a fire destroyed Plaintiff's home. (Docket No. 97 at ¶ 24.) The Deed of Trust contained several provisions applicable in the event of loss, including the following:

> **2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority:

---

[2] Unless otherwise noted, references to "complaint" are to Plaintiff's fourth amended complaint.

[3] Plaintiff and her former wife, Debra Krueger, entered into the Deed of Trust together. (Docket No. 61-1 at 2.) However, the two separated and Ms. Krueger executed a quitclaim deed on October 8, 2016, which released Ms. Kreuger's interest in the Property. (Docket No. 97 at ¶ 40; Docket No. 12-2 at 14–16.) Accordingly, the Court will not discuss Ms. Krueger's interest in the Property prior to October 8, 2016 unless necessary or relevant to the issues at hand.

3

First, to the Mortgage Insurance premiums to be paid by Lender to the Secretary or the monthly charge by the Secretary instead of the monthly mortgage insurance premiums;

Second, to any taxes, special assessments, leasehold payments or ground rents, and fire, flood and other hazard insurance premiums, as required;

Third, to interest due under the Note;

Fourth, to amortization of the principal of the Note; and,

Fifth, to late charges due under the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

* * *

**5. Property Insurance.** . . . In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. . . . Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

* * *

**7. Preservation, Maintenance and Protection of the Property; Inspections.** . . . Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient

4

to repair or restore the Property, Borrower is not relieved of Borrower's obligation
for the completion of such repair or restoration.

(Docket No. 13-1 at 4–6.)

Plaintiff notified SWBC and her insurer, Farm Bureau, about the fire and indicated that she planned to rebuild her home. (Docket No. 97 at ¶¶ 25, 27, 43.) Plaintiff's insurance policy with Farm Bureau covered the actual cost to replace any covered structures on the Property, but only the actual cash value of the damage would be paid until actual replacement of the house was completed. (Docket No. 12-2 at 20.) However, if the amount that was actually and necessarily spent exceeded the limit of liability, Farm Bureau would pay that additional amount not to exceed 20% of the coverage limit. (*Id.*) Farm Bureau would pay the costs to replace the house only if those costs were incurred within a certain amount of time from the date of loss. (*Id.*)

About a month after the fire, on December 21, 2017, SWBC sent Plaintiff a "Property Loss Claim Package," which contained instructions for Plaintiff to follow to process her claim related to the fire. (Docket No. 97 at ¶ 28.) Also on December 21, 2017, Farm Bureau issued a check for insurance proceeds to both Plaintiff and SWBC that totaled $218,400.00. (*Id.* at ¶ 16; Docket No. 12-2 at 70.) SWBC deposited the check into a restricted escrow account on December 26, 2017. (Docket No. 97 at ¶ 16.) Around this same time, Farm Bureau ordered an estimate for the cost to rebuild the house, which totaled $260,755.50. (Docket No. 12-2 at 40–68.) This estimated cost to rebuild exceeded the insurance proceeds that Farm Bureau had issued by $42,355.50. (Docket No. 97 at ¶ 17.) However, if Plaintiff rebuilt the house within a certain period of time, she would qualify for an additional 20% of insurance proceeds from Farm Bureau. (*Id.* at ¶ 43(d); Docket No. 12-2 at 20.) Farm Bureau faxed the Adjuster Worksheet to SWBC on January 11, 2018. (Docket No. 97 at ¶ 16; Docket No. 12-2 at 40.)

Later that year, SWBC transferred the Loan to PennyMac, which serviced the Loan from November 2, 2018 to February 2, 2020 and from March 17, 2020 to March 25, 2020. (Docket No. 97 at ¶¶ 3, 22.) On November 11, 2018, PennyMac sent Plaintiff a "Property Loss Claim Package," which contained instructions for Plaintiff to follow to process her claim related to the fire. (*Id.* at ¶ 29.)

Plaintiff communicated with PennyMac consistently throughout the time that PennyMac serviced the Loan. For example, Plaintiff requested to be her own builder on November 14, 2018 (*id.* at ¶ 42); sent a letter of intent to rebuild on November 27, 2018 (*id.* at ¶ 43); was told she had to send blueprints to access the insurance proceeds on December 5, 2018 (*id.* at ¶ 53); submitted a conceptual plan and bid in lieu of blueprints on December 20, 2018, the substitution of which was refused by PennyMac on January 4, 2019 and again on January 14, 2019 (*id.* at ¶¶ 62, 71, 74); requested that PennyMac send a list of documents it would need during the rebuild of the house on December 24, 2018, which was refused by PennyMac on January 14, 2019 (*id.* at ¶¶ 64, 74); and informed PennyMac that she had high blood pressure readings and her doctor put her on blood pressure medications on February 1, 2019 (*id.* at ¶¶ 82–83).

Plaintiff received payments from PennyMac for the rebuild that totaled $62,593.18, though she returned several of these payments. (*Id.* at ¶¶ 67, 73, 75, 84, 96, 103; Docket No. 12-2 at 100–01.) During the rebuild process, Plaintiff had issues paying various contractors and expenses related to the rebuild, though she continued to make principal payments on the Loan, which totaled approximately $82,000.00. (Docket No. 97 at ¶¶ 20, 62, 70.) Also throughout this time, Plaintiff experienced health issues, including swollen hands (*id.* at ¶ 82); blood pressure problems (*id.* at ¶¶ 82–83, 85); memory and focus problems (*id.* at ¶¶ 104, 107); and a diagnosis of PTSD in December 2019 (*id.* at ¶ 157).

6

On January 21, 2019, Plaintiff received a letter from PennyMac stating that the Loan was in default. (*Id.* at ¶ 77.) During phone calls with PennyMac, Plaintiff was told that PennyMac applied Plaintiff's most recent mortgage payment to a "restricted escrow account," and that she would be considered to be in default on the Loan until her next mortgage payment. (*Id.*) On June 7, 2019, Plaintiff placed the Property on the market for sale. (*Id.* at ¶ 101.) On October 28, 2019, Plaintiff lowered the sale price to $65,000. (*Id.* at ¶ 108.)

On February 3, 2020, PennyMac applied $201,132.02 of the insurance proceeds in the restricted escrow account to the unpaid principal balance of the Loan. (*Id.* at ¶ 136.) Plaintiff requested that the proceeds be applied to the principal balance with a retroactive date of November 29, 2017, which was the date of loss, but PennyMac denied the request. (*Id.*; Docket No. 12-2 at 101.) On February 6, 2020, PennyMac sent Plaintiff a Notice of Default and Intent to Accelerate, which stated that Plaintiff needed to pay $5,860.04 by March 12, 2020 or else she would risk an acceleration of the Loan and possibly the foreclosure of the Property. (*Id.* at ¶ 141; Docket No. 12-3 at 91–94.)

However, on February 28, 2020, PennyMac moved the $201,132.02 of insurance proceeds so that they no longer applied to the unpaid principle balance of the Loan, but instead were back in the restricted escrow account. (Docket No 97 at ¶ 144.) PennyMac then applied $6,072.88 of the insurance proceeds to mortgage payments and fees from November 2019 to February 2020, and then applied the remainder of the proceeds to the unpaid principal balance. (*Id.* at ¶ 145.)

On March 12, 2020, Plaintiff sent PennyMac a 37-page letter with 11 pages of attachments that provided Plaintiff's overview of the situation; responded to several letters from and phone conversations with PennyMac; provided updates on the sale of the Property; addressed what Plaintiff believed were PennyMac's breaches of the Deed of Trust; and made demands to remedy

7

what Plaintiff perceived to be issues. (*Id.* at ¶ 149; Docket No. 1-1 at 25–61.)[4] Plaintiff received a response to her letter two months later from an attorney representing PennyMac. (Docket No. 97 at ¶ 155.)

On March 25, 2020, the Property sold for $60,000. (*Id.* at ¶ 152.) On April 20, 2020, PennyMac recorded a Deed of Release stating that the Plaintiff had paid her indebtedness in full and that the Deed of Trust was discharged. (*Id.* at ¶ 153; Docket No. 13-2.)

## II.     STANDARD OF REVIEW

In reviewing a motion brought under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court must accept the well-pleaded material allegations of the pleadings as true. *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 722 (6th Cir. 2010). Additionally, the Court is required to give the pleadings of *pro se* litigants a liberal construction. *See Boswell v. Mayer*, 169 F.3d 384, 387 (6th Cir. 1999).

Although the complaint need not contain detailed factual allegations, the factual allegations supplied must be enough to show a plausible right to relief. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555–61 (2007). To state a plausible claim for relief, the alleged facts must provide "more than a sheer possibility that a defendant has acted unlawfully." *Mik v. Federal Home Loan Mortg. Corp.*, 743 F.3d 149, 157 (6th Cir. 2014) (quoting *Iqbal*, 556 U.S. at 678). The well pleaded factual allegations must "do more than create speculation or suspicion of a legally cognizable cause of action; they must show entitlement to

---

[4] The version of the March 12, 2020 letter that Plaintiff attached to her Amended Complaint does not include the 11 pages of attachments that were allegedly originally sent with the letter. (Docket No. 1-1 at 25–61.)

relief." *League of United Latin Am. Citizens v. Bredesen*, 500 F.3d 523, 527 (6th Cir. 2007) (citing *Twombly*, 550 U.S. at 555).

As a general rule, matters outside the pleadings may not be considered in ruling on a motion to dismiss under Rule 12(b)(6) unless the motion is converted to one for summary judgement under Rule 56. Fed. R. Civ. P. 12(d). However, when a document is referred to in the pleadings and is integral to the claims, it may be considered without converting a motion dismiss into one for summary judgment. *Blanch v. Trans Union, LLC*, 333 F. Supp. 3d 789, 791–92 (M.D. Tenn. 2018).

## III.    ANALYSIS

After review of the parties' filings, the Court finds that only some of the defendants' arguments for dismissal have merit. Although Plaintiff's Tennessee Consumer Protection Act claim against PennyMac and intentional infliction of emotional distress claim against PennyMac should be dismissed, both PennyMac's arguments and SWBC's arguments for dismissal of the breach of contract claim against both PennyMac and SWBC are unpersuasive.

### A.    Plaintiff's Claims Against Defendant PennyMac

In her fourth amended complaint, Plaintiff brings three claims against PennyMac: (1) breach of contract;[5] (2) violation of the Tennessee Consumer Protection Act ("TCPA"); and (3)

---

[5] With respect to her breach of contract claim, Plaintiff refers to Tenn. Code Ann. § 47-50-109, which is the statutory action for unlawful procurement of breach of contract. (Docket No. 97 at 54.) Under Tennessee law, this statutory claim is equivalent to the common law claim for tortious interference with contract. *Hauck Mfg. Co. v. Astec Industries, Inc.*, 376 F.Supp.2d 808, 832 (E.D. Tenn. 2005) (citing *Buddy Lee Attractions, Inc. v. William Morris Agency, Inc.*, 13 S.W.3d 343, 359 (Tenn. Ct. App. 1999)). The elements for either cause of action are: (1) a legal contract existed; (2) the defendants knew the contract existed; (3) the defendants intended to induce a breach of that contract; (4) the defendants acted with malice; (5) the contract was breached; (6) the defendants' actions were the proximate cause of the breach; and (7) the plaintiff suffered damages. *See Robinson v. City of Clarksville*, No. M2019-02053-COA-R3-CV, 2023 WL 1230159, at *10 (Tenn. Ct. App. Jan. 31, 2023).

intentional infliction of emotional distress ("IIED").[6] (Docket No. 97 at ¶¶ 160–81.) As detailed below, the Court recommends that Plaintiff's claims for violation of the TCPA and for IIED be dismissed for failure to state a claim, but that Plaintiff's claim for breach of contract claim survive dismissal.

### 1. <u>Breach of Contract</u>

In her fourth amended complaint, Plaintiff alleges that PennyMac breached the Deed of Trust. Under Tennessee law, to assert a common law breach of contract claim, a plaintiff must allege: "(1) the existence of an enforceable contract, (2) nonperformance amounting to a breach of the contract, and (3) damages caused by the breach of the contract." *Tolliver v. Tellico Village Prop. Owners Assoc., Inc.*, 579 S.W.3d 8, 25 (Tenn. Ct. App. 2019) (quoting *ARC LifeMed, Inc. v. AMC–Tennessee, Inc.*, 183 S.W.3d 1, 26 (Tenn. Ct. App. 2005)).

Plaintiff adequately pleads a claim for breach of contract. Plaintiff directly alleges the existence of a valid contract between herself and PennyMac. (Docket No. 97 at ¶¶ 10, 21 ("[T]he Deed of Trust . . . [was] signed for the Property"; "SWBC sent Lawson a notice that the Loan would be transferred to [PennyMac].").) She also sufficiently alleges that PennyMac breached the Deed of Trust by failing to apply the insurance proceeds to the principal sums owed on the Loan because it was not economically feasible to rebuild or restore the Property. (*Id.* at ¶¶ 137, 161, 164, 166.) Finally, she adequately alleges that PennyMac's breach damaged her. (*Id.* at ¶ 168 ("Several

---

Under a liberal construction of the fourth amended complaint, the Court does not consider Plaintiff's contract cause of action to be one for unlawful procurement of breach of contract. Rather, the Court assumes that the reference to Tenn. Code Ann. § 47-50-109 was mistaken or inadvertent and the Court construes Plaintiff's claim as one for common law breach of contract.

[6] In the fourth amended complaint, Plaintiff alleges that PennyMac committed "intense intentional emotional distress," which the Court construes to be a claim for intentional infliction of emotional distress.

damages flow from these breaches of contract: incorrect interest paid, loss of additional Proceeds, devaluation when Selling the Property, the Architect's Retainer fee, time Lost, and work put into attempts to cope with these breaches.").)

In its motion to dismiss, PennyMac contends that Plaintiff's breach of contract claim must be dismissed because Plaintiff makes other allegations that demonstrate that no such breach actually occurred. (Docket No. 104 at 15–19.) However, this argument largely misses the mark.

As an initial matter, PennyMac concedes that Plaintiff alleged that PennyMac breached the Deed of Trust. (*Id.* at 16 ("Plaintiff alleges that PennyMac breached the Deed [of Trust] by failing to apply the Insurance Proceeds to the principal of the mortgage prior to January 11, 2018 . . . .").) Yet even without this concession, PennyMac's arguments are not persuasive under the standards of a motion to dismiss, where the Court's focus is on whether Plaintiff either directly or inferentially alleged all the material elements of a claim that are necessary to sustain recovery. *See Universal Coin & Bullion, Ltd. v. FedEx Corp.*, 971 F.Supp.2d 754, 763 (W.D. Tenn. 2013) (citing *Twombly*, 550 U.S. at 562). Given the liberal construction of pleadings afforded to *pro se* litigations, *see Boswell*, 169 F.3d at 387, the Court finds that Plaintiff has met this requirement.

To support its position on dismissal, PennyMac states that Plaintiff "initially indicated" that "restoration or repair of the Property was economically feasible." (*Id.*) It argues that this "indication" demonstrates that PennyMac could not have breached the Deed of Trust when it held the Insurance Proceeds in a restricted escrow account while Plaintiff attempted to restore the Property. (*Id.*) However, PennyMac fails to point to a place in Plaintiff's complaint where she alleges or makes such an "indication" that restoration or repair of the Property was economically feasible. In contrast to PennyMac's argument, Plaintiff consistently alleges that it was *not* "economically feasible" to restore or repair the Property. (Docket No. 97 at ¶¶ 14 n.3, 164.)

Although Plaintiff's complaint may not be the most artfully or clearly drafted, PennyMac has failed to show that Plaintiff meaningfully contradicted her allegation regarding economic feasibility at any point in the operative complaint.

Further, and more importantly, whether restoration or repair of the Property was or was not "economically feasible" – which is what PennyMac asks the Court to determine – is inappropriate to decide in the context of a Rule 12(b)(6) motion to dismiss. *See Gillis v. Wells Fargo Bank, N.A.*, 875 F.Supp.2d 728, 737 (E.D. Mich. 2012) ("While Wells Fargo was entitled under the mortgage to make different use of the proceeds if restoration or repair was not economically feasible or its security would be lessened, there is no evidence before the Court that this was the case. Moreover, consideration of such evidence would be inappropriate to decide this Rule 12(b)(6) motion."). To support its contention that restoration of the Property was "economically feasible" and, therefore, PennyMac had "no contractual obligation to apply the Insurance Proceeds to the Loan," PennyMac points to district court cases from other circuits: *Vongohren v. CitiMortgage, Inc.*, No. JFM-14-3549, 2016 WL 739070, at *4 (D. Md. Feb. 25, 2016); *Everidge v. Wells Fargo Bank, N.A.*, No. 5:12-CV-497 (LJA), 2015 WL 5786738, at *16–17 (M.D. Ga. Sept. 29, 2015). (Docket No. 104 at 18–19.) These decisions are not binding on this Court and have no bearing on whether Plaintiff's breach of contract claim survives a motion to dismiss. The courts in those cases were analyzing the parties' claims under a summary judgment standard and determining whether any genuine issues of material fact existed, which is not the Court's role in the context here of a motion to dismiss. Further, as stated above, it is inappropriate to decide at the motion to dismiss stage whether it was or was not "economically feasible" to restore or repair the Property.

PennyMac also argues that Plaintiff failed to plead that she met her contractual obligation to "promptly" restore the Property, as she was required to do pursuant to the terms of the Deed of

Trust. (Docket No. 104 at 16.) PennyMac contends that the fire occurred in November 2017, but Plaintiff had not taken the steps necessary to rebuild the Property by November 2018 when the Loan was sold to PennyMac, which means Plaintiff did not act "promptly." (*Id.* at 16–17.) PennyMac also argues that Plaintiff did not allege that she "took the necessary steps for the release of funds to commence rebuilding prior to the transfer of the Loan to PennyMac." (*Id.* at 17.) The Court disagrees.

Plaintiff sufficiently alleged what steps she took to restore the Property and why certain of her construction efforts were delayed or put on hold. (Docket No. 97 at ¶¶ 39–40, 43, 167.) Whether Plaintiff's restoration or repair of the Property was done "promptly" under the Deed of Trust is a question for the trier of fact to determine at a later stage in the proceedings and cannot serve as the basis to dismiss Plaintiff's breach of contract claim under Rule 12(b)(6).

In addition, PennyMac contends that Plaintiff's allegations of damages are "meritless" and therefore the breach of contract claim must be dismissed. (Docket No. 104 at 19–20.) PennyMac argues that Plaintiff "received $23,864.00 in excess proceeds from the sale of the Property" and, therefore, did not sustain damages resulting from the breach of contract. (*Id.*) The Court is not persuaded by this argument.

Plaintiff clearly alleged damages as a result of the breach, including a devaluation of the Property and what Plaintiff alleges were overpayments of the principle balance of the Loan, among others. (Docket No. 97 at ¶ 168.) Once again, PennyMac ignores Plaintiff's allegations and focuses on issues to be decided by a trier of fact at a later stage of litigation.

For these reasons, the Court finds that Plaintiff has adequately stated a claim for breach of contract. Many of the arguments raised by PennyMac are more appropriate, if at all, for a motion

13

for summary judgment after discovery has been completed. Accordingly, Plaintiff's claim for breach of contract against PennyMac should not be dismissed.

### 2. <u>Violation of the Tennessee Consumer Protection Act</u>

Although Plaintiff's breach of contract claim should survive dismissal, her claim under the TCPA does not fare as well. The TCPA outlaws "[u]nfair or deceptive acts or practices affecting the conduct of any trade or commerce." Tenn. Code Ann. § 47-18-104(a). It is a cause of action available to "[a]ny person who suffers an ascertainable loss of money or property, real, personal, or mixed, or any other article, commodity, or thing of value wherever situated, as a result of the use or employment by another person of an unfair or deceptive act or practice described in § 47-18-104(b)." Tenn. Code Ann. 47-18-109(a)(1).

In order to plead a claim under the TCPA, a plaintiff must plausibly allege that: (1) the defendant engaged in an unfair or deceptive act or practice declared unlawful by the TCPA; and (2) the defendant's conduct caused an ascertainable loss of money or property. *Tucker v. Sierra Builders*, 180 S.W.3d 109, 115 (Tenn. Ct. App. 2005). The TCPA is liberally construed to protect consumers and others from those who engage in deceptive acts or practices. *See Morris v. Mack's Used Cars*, 824 S.W.2d 538, 540 (Tenn. 1992). Tennessee courts therefore broadly define a "deceptive" act or practice as any "one that causes or tends to cause a consumer to believe what is false or that misleads or tends to mislead a consumer as a matter of fact." *Audio Visual Artistry v. Tanzer*, 403 S.W.3d 789, 809–10 (Tenn. Ct. App. 2012).

In her complaint, Plaintiff alleges that PennyMac took three actions that violated the TCPA: (1) PennyMac sent Plaintiff an "insurance claim package" that "falsely and deceptively claimed to be a comprehensive set of instructions for processing" Plaintiff's claim (Docket No. 97 at ¶ 171); (2) PennyMac "blocked [Plaintiff's] ability to rebuild with unfair and deceptive acts and

practices," which included "demanding blueprints" from Plaintiff and imposing other "requirements" on Plaintiff (*id.* at ¶ 172); and (3) PennyMac manufactured a "fake loan default" to enable it to accelerate the terms of the Loan and foreclose on the Property, which forced Plaintiff to sell the Property (*id.* at ¶ 173).

PennyMac argues that Plaintiff's TCPA claim should be dismissed because all three alleged violations are time barred by the applicable one-year statute of limitations. The TCPA provides that "any action commenced pursuant to § 47–18–109 shall be brought within one (1) year from a person's discovery of the unlawful act or practice." Tenn. Code Ann. § 47–18–110. Under Tennessee's discovery rule, a claim accrues and the statute of limitations begins running "when the plaintiff knows or in the exercise of reasonable care and diligence should know that an injury has been sustained as a result of wrongful or tortious conduct by the defendant." *John Kohl & Co. P.C. v. Dearborn & Ewing*, 977 S.W.2d 528, 532 (Tenn. 1998) (citations omitted). Accordingly, if Plaintiff's TCPA cause of action accrued prior to February 1, 2020, it is time-barred by the one-year statute of limitations. *See Montesi v. Nationwide Mut. Ins. Co.*, 970 F.Supp.2d 784, 789 (W.D. Tenn. 2013).

In her response to PennyMac's motion to dismiss, Plaintiff argues that the Court should not dismiss her TCPA claims for several reasons, including that "whether a plaintiff exercised reasonable care and diligence in discovering her injury is usually a fact question for the trier of fact to determine." (Docket No. 110 at 15 (quoting *Coffey v. Coffey*, 578 S.W.3d 10, 22 (Tenn. Ct. App. 2018).) Although this is a correct statement of law, when undisputed evidence can lead to only one conclusion, the time at which a claim accrues can be a question of law for the court to determine. *Montesi*, 970 F.Supp.2d at 790 (citing *Reid v. Baker*, No. 10–2413–STA, 2011 WL 976547, at *8 (W.D. Tenn. Mar. 16, 2011), *aff'd*, 499 F. App'x 520 (6th Cir. 2012); *City of*

15

*Chattanooga v. Hargreaves Assocs.*, No. E2011–01197–COA–R3–CV, 2012 WL 2353688, at \*12 (Tenn. Ct. App. June 21, 2012); *Taylor v. Metro. Gov't of Nashville*, No. M2007–01774–COA–R3–CV, 2008 WL 5330502, at \*6 (Tenn. Ct. App. Dec. 19, 2008); *Osborne Enter., Inc. v. City of Chattanooga*, 561 S.W.2d 160, 165 (Tenn. Ct. App. 1977)). As detailed below, the Court finds that Plaintiff's allegations in the complaint can only lead to one conclusion, which is that she discovered the TCPA violations more than one year before she commenced litigation.

For the first TCPA violation, Plaintiff alleges that PennyMac sent her the "insurance claim package" on November 11, 2018 and that she "discovered its falsity" on December 11, 2019. (Docket No. 97 at ¶¶ 171(a)(i), (iii).) The complaint contains no other factual allegations regarding when Plaintiff discovered the violation, though it does allege that PennyMac responded to a demand letter from Plaintiff on January 31, 2020 and February 19, 2020 (*id.* at ¶ 171(a)(v)) and that the Property sold on March 25, 2020 (*id.* at ¶ 171(c)(iv)). In her response to the motion to dismiss, Plaintiff argues that she was not "put on notice" of "any injuries requiring legal contemplation" until PennyMac verbally responded to Plaintiff on January 31, 2020 "with its refusal to remedy the problems covered in her demand letters" and that this occurred within the one-year statute of limitations. (Docket No. 110 at 16–17.)

However, the question is not when Plaintiff was aware that the "omission wouldn't be remedied." (*Id.* at 17.) Rather, the question is when Plaintiff knew or should have known that she had sustained an injury as a result of PennyMac's alleged wrongful conduct. Even though Plaintiff may have "had hope" that PennyMac would remedy its alleged "bad acting" and that she would not "have to take a legal route to recover" (Docket No. 110 at 15), the complaint clearly and unequivocally states that Plaintiff knew by December 11, 2019 that she had sustained an injury as a result of alleged wrongful conduct by PennyMac. *See John Kohl & Co. P.C.*, 977 S.W.2d at 532.

16

Because this discovery occurred more than one year before Plaintiff initiated her lawsuit, this first TCPA violation is time-barred.

For the second TCPA violation, Plaintiff alleges that PennyMac blocked her from rebuilding her home from November 14, 2018 to May 23, 2019 and that she "discovered" that PennyMac "shouldn't have even played a part in the Rebuild" on December 11, 2019, which is the same day on which she "demanded a remedy" from PennyMac. (*Id.* at ¶¶ 172(a)(i), (iv), (v).) Plaintiff further alleges that "amnesia and other health problems prevented her from asserting her rights for [PennyMac's] conduct before 2021." (*Id.* at ¶ 172(a)(vii).) While this may be true as alleged, these health problems have no bearing on the date on which Plaintiff discovered PennyMac's alleged TCPA violation. Once again, Plaintiff argues that she did not know that she would need to seek "justice" in a "Court of Law" until January 31, 2020. (Docket No. 110 at 18.) However, this argument again misses the mark – the question is when Plaintiff knew that she had sustained an injury due to PennyMac's conduct. According to Plaintiff's complaint, she made this discovery on December 11, 2019, which was more than one year before she initiated this lawsuit. Accordingly, this second TCPA violation is time-barred.

For the third TCPA violation, Plaintiff alleges that PennyMac "manufactured a fake loan default" and foreclosure and that she knew "injuries would be sustained" by December 11, 2019. (Docket No. 97 at ¶ 173(a)(i).) Once again, the complaint contains no other factual allegations regarding when Plaintiff discovered the violation, though it does assert that she did not sustain an injury until March 25, 2020 when the Property was sold. (*Id.* at ¶ 173(a)(ii).) However, in her complaint, Plaintiff alleges that her damages include the misapplication of the insurance proceeds and the value of her lost work hours (*id.* at ¶ 173(c)), both of which occurred more than one year before she initiated the lawsuit. In addition, Plaintiff unambiguously states that she knew that she

would sustain injuries prior to the limitations period. Accordingly, this third TCPA violation is time-barred.

Further, even if the third TCPA violation was not barred by the statute of limitations, the Court finds that Plaintiff has failed to state a claim for relief because the TCPA does not apply to foreclosure proceedings. *See, e.g.*, *Pickle v. Branch Banking & Trust Co.*, No. 3:16-cv-01202, 2018 WL 4076959, at *2 (M.D. Tenn. Aug. 27, 2018) ("Plaintiff's TCPA claim would still fail because the TCPA does not apply to wrongful foreclosure actions or loan modification claims.") (citing *Layne v. Ocwen Loan Servicing, LLC*, No. 4:17-CV-4, 2018 WL 1524608, at *3 (E.D. Tenn. Mar. 28, 2018)); *Muheljic v. Bank of America, N.A.*, No. 2:14–00051, 2014 WL 6085869, at * 5 (M.D. Tenn. Nov. 12, 2014) ("Tennessee courts have found that the TCPA does not apply to mortgage foreclosure proceedings.") (quoting *Hossain v. Ocwen Loan Servicing, LLC*, No. 3:14-0002, 2014 WL 4347620, at *6 (M.D. Tenn. Aug, 29, 2014)); *Vaughter v. BAC Home Loans Servicing, LP*, No. 3:11–CV–00776, 2012 WL 162398, at *6 (M.D. Tenn. Jan. 19, 2012) ("[T]he Court agrees with Defendant that the TCPA does not apply to mortgage foreclosures."). In her response to the motion to dismiss, Plaintiff characterizes the question of whether the TCPA applies to foreclosure proceedings as a genuine issue of material fact to be decided by the trier of fact, but this is incorrect, as detailed above. (Docket No. 110 at 24.) Tennessee law is clear on this question, which results in Plaintiff's failure to state a claim for this particular violation of the TCPA.

For these reasons, the Court finds that Plaintiff has failed to adequately state a claim for violation of the Tennessee Consumer Protection Act and recommends that this claim be dismissed in its entirety.

18

3.    **Intentional Infliction of Emotional Distress**

In her fourth amended complaint, Plaintiff alleges that PennyMac caused Plaintiff to feel "terror" as a result of PennyMac's "chronic, intense, intentional conduct." (Docket No. 97 at ¶ 175.) To state a claim for IIED under Tennessee law, a plaintiff must allege that the conduct complained of: (1) was intentional or reckless; (2) was "so outrageous that it is not tolerated by civilized society"; (3) and resulted in "serious mental injury." *Doe 1 ex rel. Doe 1 v. Roman Catholic Diocese of Nashville*, 154 S.W.3d 22, 31, 41 (Tenn. 2005) (quoting *Bain v. Wells*, 936 S.W.2d 618, 623 (Tenn. 1997)). As Tennessee courts have explained:

> In describing these elements, we have emphasized that it is not sufficient that a defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress. A plaintiff must in addition show that the defendant's conduct was so outrageous in character, and so extreme in degree, as to *go beyond all possible bounds of decency* and to be regarded as *atrocious*, and *utterly intolerable* in a civilized community.

*Lourcey v. Estate of Scarlett*, 146 S.W.3d 48, 51 (Tenn. 2004) (emphasis added) (internal citations and quotation marks omitted). The standard is objective rather than subjective. *See Doe v. Belmont Univ.*, 334 F. Supp. 3d 877, 903 (M.D. Tenn. 2018) ("[T]he standard is not whether *an aggrieved person* (such as Doe) considers a party's actions to have been so outrageous, but whether *a civilized society* would so find.")

As the foregoing suggests, the standard for outrageous conduct "is high, indeed." *Levy v. Franks*, 159 S.W.3d 66, 85 (Tenn. Ct. App. 2004). Several cases illustrate just how "high" the bar is under Tennessee law:

> The case of *Lourcey v. Estate of Scarlett*, 146 S.W.3d 48 (Tenn. 2004) illustrates the high standard imposed by this element: the deceased defendant's conduct was "outrageous" when he told a passerby that his wife was having a seizure and shot his wife and himself in front of the passerby while she was calling 911 for help. *Lourcey*, 146 S.W.3d at 52. Excessive phone calls satisfied this element in *Nairon v. Holland*, No. M2006-00321-COA-R3CV, 2007 WL 626953 (Tenn. Ct. App. Mar. 1, 2007). There, the defendant made hundreds of phone calls within the span

19

of several months, would let the phone ring for long periods of time, would either whistle or play the radio when the phone was picked up, or would threaten the listener. *Nairon*, No. M2006-00321-COA-R3CV, 2007 WL 626953, at *6. Similarly, allegations of overly aggressive debt collection attempts by letter and by phone satisfied this second element in *Moorhead v. J. C. Penney Company*, 555 S.W.2d 713 (Tenn. 1977). In *Moorhead*, J.C. Penney erroneously assessed fees against the plaintiffs, and despite the plaintiffs' efforts to correct the error and J.C. Penney's own recognition of the error, the company instituted an antagonistic campaign by mail and phone to collect the disputed debt. *Moorhead* v, 555 S.W.2d at 715-17. For more than a year, J.C. Penney made numerous phone calls and sent approximately forty-two threatening letters and bills to the plaintiffs in which the company threatened to damage the plaintiffs' credit reputation and interfere with their employment opportunities. *Id.* at 717.

*Cunningham v. Vanderbilt Univ.*, No. 3:16-cv-00223, 2017 WL 1076478, at * 4 (M.D. Tenn. Feb. 27, 2017), *report and recommendation adopted*, 2017 WL 1064381 (M.D. Tenn. Mar. 21, 2017).

As alleged by Plaintiff in the fourth amended complaint, PennyMac's conduct does not plausibly constitute "outrageous conduct." To support her IIED claim, Plaintiff asserts that PennyMac had ongoing and nearly daily communications with her; required her to submit blueprints; "badger[ed]" her for permission to apply the Insurance Proceeds in a particular manner; sent her notices and letters; made misleading statements to her; and attempted to "push" her into foreclosure. (Docket No. 97 at ¶¶ 49, 53, 133, 147, 149.)

While these actions could undoubtedly cause frustration, none in isolation or in conjunction rise to the level of outrageous conduct that is exemplified in the applicable outrageous conduct cases. As Plaintiff concedes in her response in opposition to the motion to dismiss, "This isn't a case of a torn relationship, excessive or obscene phone calls, or relentlessly chasing a client to pay a bill." (Docket No. 110 at 28–29.) Although Plaintiff may have experienced immense frustration as a result of her interactions with PennyMac, she fails to plausibly allege facts to demonstrate that PennyMac's actions were "utterly intolerable in a civilized community," *Lourcey*, 164 S.W.3d at

51. Accordingly, Plaintiff's allegations do not reach the "high" standard for outrageous conduct that is required under Tennessee law. *Levy*, 159 S.W.3d at 85.

For these reasons, the Court finds that Plaintiff has failed to adequately state a claim for intentional infliction of emotional distress and recommends that this claim be dismissed.

## B.     Plaintiff's Claim Against Defendant SWBC

In her fourth amended complaint, Plaintiff brings one claim against SWBC for breach of contract.[7] (Docket No. 97 at ¶¶ 160–69.) The Court recommends that this claim not be dismissed for many of the same reasons that it recommends Plaintiff's breach of contract claim against PennyMac not be dismissed.

SWBC argues that Plaintiff's breach of contract claim fails because it was "economically feasible" for Plaintiff to rebuild on the Property. (Docket No. 106 at 9.) To support this assertion, SWBC defines the term "feasibility" and emphasizes that the operative question is whether it was objectively possible for Plaintiff to rebuild and not whether Plaintiff was subjectively able to afford to rebuild. (*Id.*) SWBC then contends that Plaintiff failed to allege any facts to show on either an objective or subjective basis that it was not economically feasible to rebuild, and argues that this failure necessitates dismissal of the breach of contract claim. (*Id.* at 9–10.) SWBC also argues that Plaintiff had "replacement cost coverage" under her insurance policy, so she could have received additional funds to cover the costs to rebuild, which is further proof that it was economically feasible to rebuild. (*Id.* at 10–11.) Finally, SWBC argues that the proceeds that Plaintiff received from selling her Property "paid the balance [of the Loan] off in full, and Plaintiff received a profit." (*Id.* at 11.)

---

[7] *See supra* n.4.

As detailed above, whether it was or was not "economically feasible" to restore or repair the Property – which is what SWBC asks the Court to determine – is inappropriate to decide in the context of a Rule 12(b)(6) motion to dismiss. *See Gillis*, 875 F.Supp.2d at 737. This is a question for the trier of fact to determine at a later stage in the proceedings and cannot serve as the basis to dismiss Plaintiff's breach of contract claim under Rule 12(b)(6).

Further, Plaintiff adequately plead a claim for breach of contract against SWBC. In the fourth amended complaint, Plaintiff directly alleges the existence of a valid contract between herself and SWBC. (Docket No. 97 at ¶¶ 2, 10 ("SWBC . . . originated [Plaintiff's] mortgage loan (the "Loan") for the Property and serviced the Loan from October 2016 through October 2018."; "[T]he Deed of Trust . . . [was] signed for the Property.").) Plaintiff also sufficiently alleges that SWBC breached the Deed of Trust by failing to apply the insurance proceeds to the principal sums owed on the Loan because it was not economically feasible to rebuild or restore the Property. (*Id.* at ¶¶ 161, 164, 166.) Finally, Plaintiff adequately alleges that SWBC's breach damaged her. (*Id.* at ¶ 168 ("Several damages flow from these breaches of contract: incorrect interest paid, loss of additional Proceeds, devaluation when Selling the Property, the Architect's Retainer fee, time Lost, and work put into attempts to cope with these breaches. . . . [Plaintiff] overpaid SWBC by $12,394.").)

In addition, Plaintiff's breach of contract claim is timely under the six-year limitations period generally applicable to contract claims under Tennessee law. Tenn. Code Ann. § 28-3-109(a)(3). SWBC argues that "Plaintiff's allegations all relate to and stem from the loss of her house," and therefore the "gravamen of the claim . . . more significantly concerns damage to real property," so the three-year limitations period generally applicable to real property claims under

Tennessee law, Tenn. Code Ann. § 28-3-105, should apply. (Docket No. 106 at 11–13.) The Court disagrees.

When determining the applicable limitations period, a court should "identify the gravamen of each claim" rather than the gravamen of the complaint as a whole. *Hinman v. Valleycrest Landscape Development, Inc.*, No. 3:19-cv-00551, 2020 WL 434161, at *16 (M.D. Tenn. Jan. 28, 2020) (quoting *Benz-Elliott v. Barrett Enterprises, LP*, 456 S.W.3d 140, 141 (Tenn. 2015)). The court must "first consider the legal basis of the claim and then consider the type of injuries for which damages are sought." *Id.* (quoting *Benz-Elliot*, 456 S.W.3d at 151). This type of analysis is "necessarily fact-intensive and requires a careful examination of the allegations of the complaint as to each claim for the types of injuries asserted and damages sought." *Id.* (quoting *Benz-Elliot*, 456 S.W.3d at 151).

As detailed above, Plaintiff sufficiently brings a claim against SWBC for breach of the Deed of Trust. Plaintiff seeks compensatory damages related to SWBC's alleged failure to apply the insurance proceeds to the principal sums owed on the Loan. This includes, among other amounts, $12,394.00 that Plaintiff overpaid to SWBC. (Docket No. 97 at ¶ 168.) She also seeks injunctive relief related to her credit score and to policies and procedures implemented by SWBC and PennyMac. (*Id.* at 70–71.) Although some of these damages may not be available as remedies for breach of contract, the damages clearly arise from, and are related to, the alleged breach of the Deed of Trust. *See Hinman*, 2020 WL 434161 at *17. Further, although Plaintiff's allegations do relate to the loss of her house, her claim is squarely centered around the Deed of Trust. The Court, therefore, concludes that "the legal basis of the claim is breach of contract and the damages sought . . . are for breach of contract." *Benz-Elliott*, 456 S.W.3d at 152. Consequently, the breach of contract claim is governed by the six-year statute of limitations applicable to "[a]ctions on

23

contracts not otherwise expressly provided for." Tenn. Code Ann. § 28-3-109(a)(3). The motion to dismiss the contract claim on the basis that it is barred by the three-year statute of limitations generally applicable to real property claims and set forth in Tenn. Code Ann. § 28-3-105 should, therefore, be denied.

## IV.    RECOMMENDATION

For the reasons set forth above, it is respectfully RECOMMENDED that:

1.     Defendant PennyMac Loan Services, LLC's motion to dismiss (Docket No. 103) be GRANTED with respect to Plaintiff's Tennessee Consumer Protection Act claim and intentional infliction of emotional distress claim and these claims be DISMISSED;

2.     Defendant PennyMac Loan Services, LLC's motion to dismiss (Docket No. 103) be DENIED in all other respects; and

3.     Defendant SWBC Mortgage Corp.'s motion to dismiss (Docket No. 105) be DENIED.

ANY OBJECTIONS to this Report and Recommendation must be filed within fourteen (14) days of service of this Report and Recommendation and must state with particularity the specific portions of this Report and Recommendation to which objection is made. *See* Rule 72(b)(2) of the Federal Rules of Civil Procedure and Local Rule 72.02(a). Failure to file written objections within the specified time can be deemed a waiver of the right to appeal the District Court's Order regarding the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Any response to the objections

must be filed within fourteen (14) days after service of objections. *See* Federal Rule 72(b)(2) and Local Rule 72.02(b).

It is SO ORDERED.

_____
BARBARA D. HOLMES
United States Magistrate Judge