# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### AT NASHVILLE

| | | |
|---|---|---|
| **JULIE LAWSON** | ) | |
| | ) | **Case No. 3:21-cv-00197** |
| **v.** | ) | **Judge Trauger** |
| | ) | **Magistrate Judge Holmes** |
| **PENNYMAC LOAN SERVICES, LLC** | ) | |

**To: The Honorable Aleta A. Trauger, United States District Judge**

## REPORT AND RECOMMENDATION

By order entered March 12, 2021, the above captioned *pro se* civil case was referred to the

Magistrate Judge for pretrial matters under 28 U.S.C. §§ 636(b)(1)(A) and (B), Rule 72 of the

Federal Rules of Civil Procedure, and the Local Rules of Court. (Docket No. 5.)

Pending before the court is Defendant Pennymac Loan Services, LLC's motion for

summary judgment (Docket No. 165), which is opposed by Plaintiff Julie Lawson. For the reasons

set forth below, the undersigned respectfully recommends that the motion for summary judgment

be **GRANTED**.[1]

## I. FACTUAL AND PROCEDURAL BACKGROUND

This case concerns a dispute between Ms. Lawson and her mortgage provider over how

proceeds from her home insurance policy were to be applied after a fire destroyed Ms. Lawson's

home. Ms. Lawson believes that one of her mortgage providers, Pennymac, breached the deed of

trust between the two parties because Pennymac failed to apply those insurance proceeds to the

---

[1] Separately pending are two motions from Ms. Lawson that are related to Ms. Lawson's response to the motion for summary judgment: (1) "Motion to File 'Lawson Evidence 3' Thumb Drive with December 22, 2025 Filing" (Docket No. 205), and (2) "Motion to Correct Clerical Errors Affecting Evidence Attached to Document 203 and Validity of Documents 207, 207.1, 207.3, and 208" (Docket No. 209). The court will address these two motions by separate order.

principal sums owed on Ms. Lawson's mortgage and instead allowed Ms. Lawson to use the proceeds to rebuild her home.

On October 1, 2016, Ms. Lawson executed a deed of trust and promissory note for her home at 7456 Sleepy Hollow Road, Fairview, Williamson County, Tennessee 37062.[2] (Docket No. 97 at ¶ 10; Docket No. 61-1 at 2–12.) The deed of trust contained several provisions applicable in the event of loss, including the following:

> **2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority:
> First, to the Mortgage Insurance premiums to be paid by Lender to the Secretary or the monthly charge by the Secretary instead of the monthly mortgage insurance premiums;
> Second, to any taxes, special assessments, leasehold payments or ground rents, and fire, flood and other hazard insurance premiums, as required;
> Third, to interest due under the Note;
> Fourth, to amortization of the principal of the Note; and,
> Fifth, to late charges due under the Note.
> Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.
>
> * * *
>
> **5. Property Insurance.** . . . In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. . . . Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse

---

[2] Ms. Lawson and her former wife, Debra Krueger, entered into the deed of trust together. (Docket No. 61-1 at 2.) However, the two separated and Ms. Kreuger executed a quitclaim deed on October 8, 2016, which released Ms. Kreuger's interest in the property. (Docket No. 97 at ¶ 40; Docket No. 12-2 at 14–16.) Accordingly, the court will not discuss Ms. Krueger's interest in the property unless relevant.

2

proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

\* \* \*

**7. Preservation, Maintenance and Protection of the Property; Inspections.** . . . Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

(Docket No. 61-1 at 5–7.)

Former defendant SWBC Mortgage Corp. was the original servicer of the loan, which was made in the principal amount of $240,562.00. (Docket No. 97 at ¶¶ 2, 167.) SWBC then transferred the loan to Pennymac, which serviced the loan from November 2, 2018 to February 2, 2020 and from March 17, 2020 to March 25, 2020. (*Id.* at ¶ 3.)

On November 29, 2017, Ms. Lawson's home was destroyed in a fire. (*Id.* at ¶ 24.) Ms. Lawson had a home insurance policy with Farm Bureau. (Docket No. 12-2 at 20; Docket No. 97 at ¶ 23.) This policy covered the actual cost to replace any covered structures on the property, but only the actual cash value of the damage would be paid until actual replacement of the house was completed. (*Id.*) However, if the amount that was actually and necessarily spent exceeded the limit

3

of liability, Farm Bureau would pay that additional amount not to exceed 20% of the coverage limit. (*Id.*) Farm Bureau would pay the costs to replace the house only if those costs were incurred within a certain amount of time from the date of loss. (*Id.*)

Shortly after the fire, on December 5, 2017, a third-party estimated that the cost to rebuild Ms. Lawson's home would be $260,755.50. (Docket No. 12-2 at 41–68.) On December 21, 2017, Farm Bureau issued a check for insurance proceeds to both Ms. Lawson and SWBC that totaled $218,400.00. (*Id.* at 70.) On December 22, 2017, Ms. Lawson informed SWBC that her intention was to rebuild her home. (Docket No. 97 at ¶ 15; Docket No. 168-8.) Pennymac took over the loan on November 2, 2018. (Docket No. 167-1 at ¶ 5.)

On November 11 or 14, 2018, Ms. Lawson wrote to Pennymac and requested to be her own builder and for a disbursement of funds from her insurance proceeds. (Docket No. 97 at ¶ 149(c); Docket No. 168-12.) Pennymac disbursed funds to Ms. Lawson in late 2018 and early 2019. (Docket No. 97 at ¶ 67; Docket No. 97 at 15; Docket Nos. 168-15, 168-17, 168-18, 168-19, 168-20, 168-21.) Ms. Lawson returned some but not all those funds to Pennymac. (Docket No. 97 at 15; Docket No. 167-1 at ¶¶ 15, 19.) Ms. Lawson continued to correspond with representatives of Pennymac regarding the rebuilding of her home throughout this time period. (Docket Nos. 168-23, 168-24.) However, Ms. Lawson eventually decided to stop pursuing a rebuild of her home and to sell her property. (Docket No. 97 at ¶ 101; Docket No. 168-1 at 207–08.) On February 3, 2020, Pennymac applied the remainder of Ms. Lawson's insurance proceeds, $201,132.02, to the balance of the loan. (Docket No. 97 at ¶ 136; Docket No. 167-1 at ¶ 22.) On March 25, 2020, Ms. Lawson sold her property for $60,000.00. (Docket No. 97 at ¶ 152; Docket No. 12-3 at 38.)

On February 1, 2021, Ms. Lawson initiated this lawsuit in state court. (Docket Nos. 1-1.) Pennymac removed the lawsuit to this court on March 10, 2021. (Docket No. 1.) After several

4

amendments to the complaint, the dismissal of certain claims, and the agreed dismissal of SWBC, the only remaining claim is against Pennymac for breach of contract. (Docket Nos. 97, 113, 124.) Ms. Lawson alleges that Pennymac breached the parties' deed of trust by failing to apply the insurance proceeds to the principal sums owed on the mortgage because it was not economically feasible to rebuild or restore the property. (Docket No. 97 at ¶¶ 160–69.)

## II.    MOTION FOR SUMMARY JUDGMENT AND RESPONSE

Pennymac moves for summary judgment under Rule 56 of the Federal Rules of Civil Procedure. In support of its motion, Pennymac relies on the following: (1) a supporting memorandum (Docket No. 166); (2) a statement of undisputed material facts ("SUMF") (Docket No. 167); (3) the affidavit of Johnny Morton, a servicing litigation supervisor, and exhibits (Docket No. 167-1); (4) copies of wire information (Docket No. 167-2); and (5) Ms. Lawson's deposition transcript and exhibits (Docket Nos. 168-1 to 168-35).

Pennymac contends that it is entitled to summary judgment in its favor on Ms. Lawson's breach of contract claim for three reasons: (1) the evidence demonstrates that repair or restoration of Ms. Lawson's property was, indeed, "economically feasible" under the terms of the parties' deed of trust, and therefore Pennymac did not breach the deed of trust; (2) Ms. Lawson abandoned the specific breach of contract claim that she included in the operative complaint; and (3) Ms. Lawson should be equitably estopped by her own statements and conduct from claiming that repair or restoration was not "economically feasible." (Docket No. 166 at 14–19.) In addition, with respect to damages, Pennymac argues that Ms. Lawson cannot recover damages for emotional distress and that Pennymac is entitled to a set-off based on a settlement between Ms. Lawson and former defendant SWBC Mortgage Corp. (*Id.* at 19–22.)

5

Ms. Lawson responds in opposition to the motion and relies on the following: (1) a responding brief (Docket No. 208); (2) a response to the SUMF, Ms. Lawson's declaration, and exhibits (Docket Nos. 203, 203-1 to 203-33); and (3) an amended response to the SUMF, Ms. Lawson's amended declaration, and exhibits (Docket Nos. 207, 207-1 to 207-3).[3] Ms. Lawson argues that there are material facts in dispute – namely that it was not "economically feasible" to repair or restore her property, despite Pennymac's assertion otherwise – and that this matter should, therefore, go to trial. (Docket No. 208 at 4–5.)

The court is not unsympathetic to the daunting task faced by Ms. Lawson in responding to a motion for summary judgment without the benefit of counsel. Thus, the court views her filings less stringently than those drafted by lawyers. *See, e.g.*, *Williams v. Curtin*, 631 F.3d 380, 383 (6th Cir. 2011). Nonetheless, the leniency afforded to *pro se* litigants has limits, and *pro se* litigants are not entirely exempt from the requirements of the Federal Rules of Civil Procedure. *See, e.g.*, *Wells v. Brown*, 891 F.2d 591, 594 (6th Cir. 1989). Further, *pro se* plaintiffs "are not automatically entitled to take every case to trial," *Pilgrim v. Littlefield*, 92 F.3d 413, 416 (6th Cir. 1996), and proceeding *pro se* does not shield a plaintiff's claims from serious scrutiny at the later stages of a case, such as at the summary judgment stage. *Johnson v. Stewart*, No. 08–1521, 2010 WL 8738105, at *3 (6th Cir. May 5, 2010); *Tucker v. Union of Needletrades, Indus., & Textile Emps.*,

---

[3] In her amended response to the SUMF, Ms. Lawson asks the court "to seal the evidence at document 204, '10.27.2019 SEALED.'" (Docket No. 207 at 9, ¶ 3.) The document at Docket Entry No. 204 that Ms. Lawson wishes to seal is a manual filing. In her separate motion at Docket Entry No. 205 concerning that manual filing, Ms. Lawson specifies that she wishes to seal only one "record dated October 27, 2019." (Docket No. 205 at 1 n.1.) To the extent Ms. Lawson wishes to file any record under seal, she must file a proper motion for leave to file the document under seal in accordance with Local Rules 5.03 and 7.01 and applicable Sixth Circuit law. *See, e.g.*, *Shane Grp., Inc. v. Blue Cross Blue Shield of Mich.*, 825 F.3d 299 (6th Cir. 2016). Any requests to seal that do not comply with these rules and applicable authority will be denied.

407 F.3d 784, 788–89 (6th Cir. 2005). Ordinary civil litigants that proceed *pro se* are not entitled to special treatment, including assistance with responding to dispositive motions. *Brock v. Hendershott*, 840 F.2d 339, 343 (6th Cir. 1988). In the end, although Ms. Lawson has provided a response to Pennymac's motion and an even lengthier response to Pennymac's statement of undisputed material facts, her response suffers from shortcomings that cannot be disregarded simply because she is proceeding *pro se*.

Ms. Lawson's responses to Pennymac's SUMF[4] are set forth in a separately filed response. (Docket No. 207.) Ms. Lawson also filed two documents in support of her response: (1) her declaration (Docket No. 207-1), and (2) her "continued responses to statement of facts" (Docket No. 207-2).[5] Her response to the SUMF contains unnecessary and largely unhelpful prefatory materials, including a procedural background, definitions, requests to the court, and legal

---

[4] Pennymac's SUMF is not without criticism. The statement includes ninety-one (91) undisputed material facts. (Docket No. 167.) The Local Rules require a movant to file a "*concise, non-argumentative statement of the alleged undisputed material facts . . . that the movant contends* supports summary judgment." Local R. 56.01(c)(1) (emphasis added). Material facts are those that "may affect" the outcome of the lawsuit. *McLemore v. Gumucio*, 619 F. Supp. 3d 816, 826 (M.D. Tenn. 2021) (*rev'd on other grounds*) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A party's statement of undisputed material facts is "a place for statements of (purported) material facts crucial to the resolution of a summary judgment motion, not for mere background facts that 'surround' the lawsuit at issue. It is a place to assert pointed (and poignant) facts, not to provide broad context." *Id.* at 824. The court struggles to see how several of the facts submitted by Pennymac could be "crucial" to the resolution of Ms. Lawson's breach of contract claim. For example, Pennymac stated that Ms. Lawson was in a "romantic relationship" with the project overseer of her rebuild. (Docket No. 167 at ¶ 41; Docket No. 166 at 7.) However, this "fact" is not otherwise referenced by Pennymac to demonstrate that it is entitled to summary judgment on Ms. Lawson's claim for breach of contract. Accordingly, the court is unable to discern either how this fact is "material" or how it "may affect" the outcome of this lawsuit. Rather, Pennymac appears to have included this fact purely for salaciousness, upon which the court frowns.

[5] Ms. Lawson originally filed a response, declaration, and "continued responses" on December 22, 2025 (Docket Nos. 203, 203-1, 203-2), but then filed amended versions of these three documents on December 30, 2025 (Docket Nos. 207, 207-1, 207-2). The court will only discuss the amended versions filed on December 30, 2025.

argument. (Docket No. 207 at 1–39.) The required responses to the SUMF are at the end of the document and all include the same phrase: "See amended ev. B." (*Id.* at 40–53.) In other words, Ms. Lawson refers the court to another document for her substantive responses to the SUMF. That document, the "continued responses to statement of facts," contains lengthy responses to each statement of fact, but ultimately fails to adequately dispute any facts. (Docket No. 207-2.)

The Local Rules contain explicit instructions on what should be included in a response to a SUMF. *See* Local R. 56.01(e). For example, each individual response to a statement of fact should start with "Undisputed," "Undisputed for Summary Judgment Purposes Only," or "Disputed." Local R. 56.01(e)(2). None of Ms. Lawson's responses comply with this requirement. Instead, she states that she "cannot agree" or "cannot fully agree" with the statement, or that she "object[s]" to the statement. (*Id.* at 2–33.) Although she does not explicitly state that she disputes a fact, the court can assume that her disagreement or objections indicate that she does, indeed, dispute all of the facts included by Pennymac in its SUMF. However, Ms. Lawson fails to provide evidentiary citations to support her disputes, as required. *See* Local R. 56.01(e)(3). Instead, she provides inappropriate legal arguments. *See* Local R. 56.01(e)(5).

Those legal arguments are also unavailing. For example, Ms. Lawson argues that some of Pennymac's facts are support by a "bad deposition." (*Id.* at 3.) The deposition at issue is Ms. Lawson's February 21, 2025 deposition. (Docket No. 168-1.) Ms. Lawson argues that her own deposition is "bad" because the court reporter was a "journalist not licensed to transcribe the deposition" and because the deposition exceed the "time allowed by law." (Docket No. 207-2 at 3.) In support of these statements, Ms. Lawson refers generally to her declaration (Docket No. 207-1) but fails to point the court to any particular page or paragraph. This failure is enough to end the court's review and to find no merit to the contention that Ms. Lawson's deposition was "bad."

8

However, even with a further review of Ms. Lawson's declaration (Docket No. 207-1 at 13), the court is led to a document containing unidentified snippets of online articles or posts concerning the court reporter (Docket No. 203-26). This confusing trail of documents and seemingly irrelevant materials does not demonstrate that Ms. Lawson's deposition was improper or "bad" for any reason. The same is true for Ms. Lawson's legal arguments that the affidavit of Pennymac's business records is "improper" or that the "best evidence rule" is contradicted, among others. She provides no legal support for these arguments. Overall, Ms. Lawson fails to properly or adequately dispute any of Pennymac's statements of material fact.

For all of these reasons, to the extent that the statements of facts asserted in Pennymac's SUMF are supported by the record, the court is permitted to rely upon those statements of fact as undisputed.

## III. STANDARD OF REVIEW

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).[6] A fact is "material" within the meaning of Rule 56(c) "if its proof or disproof might affect the outcome of the suit under the governing substantive law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine dispute of material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Harris v. Klare*, 902 F.3d 630, 634–35 (6th Cir. 2018).

---

[6] Although this case is brought under diversity jurisdiction, federal procedural rules and standards for summary judgment apply. *Biegas v. Quickway Carriers, Inc.*, 573 F.3d 365, 374 (6th Cir. 2009); *Hari & Assocs. v. RNBC, Inc.*, 946 F.Supp. 531, 535 (M.D. Tenn. 1996).

9

The moving party has the burden of showing the absence of genuine factual disputes. *Anderson*, 477 U.S. at 249–50; *Pittman v. Experian Information Solutions, Inc.*, 901 F.3d 619, 627-28 (6th Cir. 2018). If the summary judgment movant meets that burden, then, in response, the non-moving party must set forth specific facts showing that there is a genuine issue for trial. *Pittman,* 901 F.3d at 628. The nonmoving party "is not entitled to trial merely on the basis of allegations; significant probative evidence must be presented to support the complaint." *Goins v. Clorox Co.*, 926 F.2d 559, 561 (6th Cir. 1991). In other words, to defeat summary judgment, the party opposing the motion must present affirmative evidence to support his or her claims; a mere "scintilla of evidence" is insufficient. *Bell v. Ohio State Univ.*, 351 F.3d 240, 247 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 252).

In considering whether summary judgment is appropriate, the court must "look beyond the pleadings and assess the proof to determine whether there is a genuine need for trial." *Sowards v. Loudon Cnty.*, 203 F.3d 426, 431 (6th Cir.), *cert. denied*, 531 U.S. 875 (2000). In doing so, the court must view the evidence and all inferences drawn from underlying facts "in the light most favorable to the party opposing the motion." *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., Ltd.*, 475 U.S. 574, 587 (1986).

## IV.    ANALYSIS

Ms. Lawson's only claim against Pennymac is for breach of contract. To succeed on this claim, Ms. Lawson must show the following: "(1) the existence of an enforceable contract, (2) nonperformance amounting to a breach of the contract, and (3) damages caused by the breach of

10

the contract."[7] *Tolliver v. Tellico Village Prop. Owners Assoc., Inc.*, 579 S.W.3d 8, 25 (Tenn. Ct. App. 2019) (quoting *ARC LifeMed, Inc. v. AMC–Tennessee, Inc.*, 183 S.W.3d 1, 26 (Tenn. Ct. App. 2005)).

There is no dispute that the deed of trust is an enforceable contract between Ms. Lawson and Pennymac. What is in dispute is whether Pennymac failed to perform under Paragraph 5 of the deed of trust, and whether that nonperformance damaged Ms. Lawson. With respect to insurance proceeds, Paragraph 5 of the deed of trust states:

> 5. Property Insurance. . . . In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. . . . **Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, _if the restoration or repair is economically feasible and Lender's security is not lessened._** During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. **_If the restoration or repair is not economically feasible_ or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.** Such insurance proceeds shall be applied in the order provided for in Section 2.

(Docket No. 61-1 at 6 (emphasis added).) The plain language indicates that if restoration or repair is economically feasible *and* Pennymac's security is not lessened, then the insurance proceeds

---

[7] Because the case is brought under federal diversity jurisdiction, the court applies the substantive law of Tennessee. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). Neither party argues otherwise.

must be applied to the restoration or repair. However, if one or both conditions do not exist, the insurance proceeds must instead be applied directly to the loan.

The parties do not dispute whether Pennymac's security would have been lessened. Rather, Ms. Lawson contends that Pennymac knew or should have known that it was not economically feasible for her to restore or repair the property. (Docket No. 97 at ¶¶ 137, 161, 164, 166.) She alleges that Pennymac had "constructive knowledge" and should have known that it was not economically feasible by either (1) January 11, 2018 when she provided the original lender with a worksheet that included a replacement estimate of $260,755.50, which was a higher amount than the insurance proceeds she had received, or (2) November 2, 2018 when Pennymac took over the loan from the original lender. (*Id.* at ¶¶ 41, 162, 164.) Ms. Lawson alleges that Pennymac should have retroactively applied the insurance proceeds to the balance of her loan with an effective date of November 29, 2017 when the loss occurred. (*Id.* at ¶ 164.)

In its summary judgment motion, Pennymac argues that it did not breach Paragraph 5 of the deed of trust because it was, in fact, economically feasible to repair or restore the property when Pennymac took over the loan on November 2, 2018. (Docket No. 166 at 15–17.) Pennymac cites an opinion from a district court in another circuit that the term "economically feasible" means "economically reasonable" or "economically practicable" rather than simply "economically possible." (*Id.* at 14 (citing *Vongohren v. Citimortgage, Inc.*, No. JFM-14-3549, 2016 WL 739070, at *4 (D. Md. Feb. 25, 2016)).) Relying on that definition, Pennymac contends that "economic feasibility" should not be determined solely by considering the amount of insurance proceeds that a borrower receives but instead should take into account other sources of income. It points to Paragraph 7 of the deed of trust, which states that, if insurance proceeds "are not sufficient to repair or restore the Property," then the borrower is not relieved of its obligation to complete the repair

12

or restoration. Along those lines, Pennymac states that the evidence shows that Ms. Lawson had access to enough money – her insurance proceeds, the potential additional 20% of her insurance policy limits, and her income in 2018 and 2019 – that she could have reasonably or practicably paid the estimated replacement cost of $260,755.50. In addition, Pennymac argues that Ms. Lawson's own communications with Pennymac – in which she expressed a desire and plan to enlarge the size of the home she was rebuilding, which she believed would increase the value of her property – demonstrate that it was "economically feasible" for her to repair or restore her property.

The parties' arguments require the court to interpret the deed of trust, and specifically the contractual term "economically feasible." The court's "initial task in construing a contract is to determine whether the language is ambiguous." *Planters Gin Co. v. Federal Compress & Warehouse Co., Inc.*, 78 S.W.3d 885, 890 (Tenn. 2002). If the language is clear and unambiguous, the literal meaning controls the outcome of the dispute. *Id.* at 890. When a contract is unambiguous, its interpretation is a question of law that is appropriate for summary judgment. *Bourland, Heflin, Alvarez, Minor & Matthews, PLC v. Heaton*, 393 S.W.3d 671, 674 (Tenn. Ct. App. 2012) ("Questions of contract interpretation are generally considered to be questions of law, and thus are especially well-suited for resolution by summary judgment.") (citation omitted). "In construing contracts, [courts] are to give effect to all the language included therein, as the law of contract interpretation militates against interpreting a contract in a way that renders a provision superfluous." *Lovett v. Cole*, 584 S.W.3d 840, 861 (Tenn. Ct. App. 2019) (citing *Crossville Med. Oncology, P.C. v. Glenwood Sys., LLC*, 610 F. App'x 464, 468 (6th Cir. 2015)).

Neither party argues that the term "economically feasible" is ambiguous. Nor does the court find the term ambiguous. Accordingly, "economically feasible" must be construed in its

13

plain, ordinary, and popular sense. *Bob Pearsall Motors, Inc. v. Regal Chrysler–Plymouth, Inc.*, 521 S.W.2d 578, 580 (Tenn. 1975). The term must also be "construed in harmony" with other provisions of the deed of trust "to promote consistency and to avoid repugnancy between the various provisions of a single contract." *Guiliano v. Cleo, Inc.*, 995 S.W.2d 88, 95 (Tenn. 1999).

Other courts have contextualized the provision in which the term "economically feasible" appears and have specifically analyzed the term. In *Avila v. CitiMortgage, Inc.*, the United States Court of Appeals for the Seventh Circuit analyzed a provision from a mortgage agreement regarding property insurance and insurance proceeds that is nearly identical to the provision in the subject deed of trust in this action. 801 F.3d 777 (7th Cir. 2015).

The Seventh Circuit held that the insurance provision was an agreement between the homeowner and lender that "exists almost exclusively" for the benefit of the lender. *Id.* at 784. "Without section 5, [the homeowner] could use the insurance proceeds to repair his house or pay down his loan at his discretion. The mortgage agreement shifts that discretion to [the lender] to ensure that repairs are 'economically feasible,' that its 'security is not lessened,' and that it will have 'an opportunity to inspect such Property to ensure the work has been completed to [its] satisfaction.'" *Id.* The *Avila* court went on to hold that this provision did not create a fiduciary relationship or require the lender to act for the benefit of the homeowner. *Id.*

In *Vongohren*, the U.S. District Court for the District of Maryland defined the term "economic feasibility." 2016 WL 739070. The court considered whether summary judgment was appropriate on two homeowners' claim that their mortgage lender breached their loan agreement by failing to turn over insurance proceeds to them or, alternatively, by failing to use the insurance proceeds to repair their property. *Id.* at *4–5. Although the underlying facts in *Vongohren* differ in significant ways from those at issue here, the parties' loan agreement included a provision on

14

insurance proceeds that is identical in all relevant respects to the deed of trust between Ms. Lawson and Pennymac. The *Vongohren* court analyzed the term "economically feasible" as follows:

> Feasibility is defined as "[t]he possibility that something can be made, done, or achieved, or that it is reasonable; practicability." *Feasibility*, BLACK'S LAW DICTIONARY (10th ed. 2014). Because "economically" modifies "feasible" in the parties' loan agreement, and defining "economically feasible" as simply "economically possible" has no limiting principle, the best interpretation of "economically feasible" is "economically reasonable" or "practicable."

*Id.* at \*4. Several other courts have adopted the *Vongohren* court's definition of "economically feasible." *See, e.g.*, *Insalaco v. Fire Ins. Exch.*, No. 20-cv-00664-JST, 2022 WL 17968763, at \*6 (N.D. Cal. Jul. 15, 2022); *Standard Fire Ins. Co. v. Carr*, No. 2:18-cv-01022-SGC, 2019 WL 4466664, at \*4 (N.D. Ala. Sept. 18, 2019) (same); *CitiMortgage, Inc. v. Kellogg*, No. FSTCV 13-6018112 S, 2025 WL 2603087, at \*7 (Conn. Super. Ct. Sept. 5, 2025). *But see Alvarez-Mejia v. Bellissimo Props., LLC*, 208 So.3d 797, 799 (Fla. Dist. Ct. App. 2016) (finding that "economically feasible" was not defined term and was subject to different interpretations).

Based on this definition, the *Vongohren* court found that there was no genuine dispute of material fact as to whether repair was economically feasible. It was neither economically reasonable nor practicable for the lender to use the insurance proceeds to repair the property because the homeowners had failed to make loan payments and had abandoned their property. *Id.* at \*4–5 ("Given the Vongohrens's refusal to continue making payments, their de facto abandonment of the property, and the projected economic loss of making repairs, there is no genuine dispute of material fact that it was not 'economically feasible' for Citi to use the insurance proceeds on repairs. On this ground alone, summary judgment is appropriate for Citi on the Vongohrens's breach of contract claim."). The *Vongohren* court also relied on the Seventh Circuit's interpretation in *Avila* of Paragraph 5 as an agreement that benefits the lender rather than the

15

homeowner and "shifts . . . discretion to [the lender] to ensure the repairs are 'economically feasible' . . . ." *Id.* at *4 (quoting *Avila*, 801 F.3d at 784).

The court finds that Pennymac is entitled to summary judgment on the question of economic feasibility. Although this court is not bound by the *Vongohren* court, the definition of "economically feasible" as "economically reasonable" or "economically practicable" – rather than "economically possible" – is a reasonable one that is in harmony with other provision of the deed of trust. *See Guiliano*, 995 S.W.2d at 95. This definition indicates that there are limitations on what is economically feasible. In other words, a repair or restoration must be reasonable or practicable rather than merely possible.

The undisputed record shows that Ms. Lawson had or could have had access to an adequate amount of funds to cover the estimated cost to rebuild her home such that repair or restoration of her property was economically reasonable or practicable. On December 5, 2017, 5ive Star Restoration estimated that it would cost $260,755.50 to rebuild Ms. Lawson's home. (Docket No. 168-12 at 18–45.) This total price included materials, labor, and 20% for the contractor's overhead and profit. (*Id.* at 45.) On December 21, 2017, Farm Bureau issued a check to Ms. Lawson and her original lender for $218,400.00, which was the approved amount of policy limits. (Docket No. 168-8 at 3; Docket No. 168-14.) This left a gap of $42,355.50 between the estimate to rebuild and the insurance proceeds received. However, Ms. Lawson's insurance policy allowed her to receive an additional $41,600.00 to repair or replace her home if the costs exceeded the limit of liability and if the costs were incurred within two (2) years from the date of loss. (Docket No. 12-2 at 20.) Had she received that additional money, she would have been left with a gap of only $755.50. Although she was not guaranteed this additional money, it was reasonable for Pennymac to believe that she would receive the money. Accordingly, Ms. Lawson's receipt of her initial insurance

16

proceeds and potential receipt of additional insurance proceeds show that it was economically reasonable or practicable for her to restore or repair her property by rebuilding a home.

Further, the undisputed record shows that Ms. Lawson intended to rebuild with the insurance proceeds she received and that she believed she would receive additional proceeds. The undisputed record also shows that she acted accordingly with respect to her rebuild. For example, on December 22, 2017, Ms. Lawson wrote a letter to her original lender stating, "As mentioned via phone several times, our intention is to rebuild our home that was destroyed by fire on 11.29.2017." (Docket No. 168-8.) The next year, on November 11, 2018, she reiterated that intention in a letter to Pennymac in which she detailed issues she had encountered with her rebuild and requested permission to act as her own general contractor. (Docket No. 168-12 at 2.) Ms. Lawson stated that the cost to rebuild would be $262,000.00 minus the costs for demolition, design, and septic tank work. (*Id.* at 3.) The undisputed record also shows that Pennymac provided funds to Ms. Lawson for her rebuild. For example, on December 26, 2018, Pennymac issued a check to Ms. Lawson and a contractor, Buckeye Quality Construction & Remodeling LLC for $24,442.00. (Docket No. 168-15.) Based on these facts, the court finds that, as of November 2, 2018 when Pennymac took over the loan from the original lender, both Ms. Lawson and Pennymac believed that it was economically feasible to repair or restore Ms. Lawson's property and that it was, indeed, economically feasible to do so.

In addition, the evidence indicates that Pennymac itself believed that it was economically feasible to repair or restore the property. As set forth above, Pennymac provided funds to Ms. Lawson for her rebuild and worked with her to achieve the rebuild, even if Ms. Lawson was frustrated with how Pennymac communicated with her. As explained by the *Avila* court, the property insurance provision in the deed of trust at issue "exists almost exclusively" for the benefit

17

of Pennymac, which has the "discretion" to "ensure that repairs are 'economically feasible.'" 801 F.3d at 784. In other words, Pennymac could have determined in late 2018 or early 2019 that restoration or repair was not economically feasible and could have stopped supporting the rebuild and instead elected to apply the insurance proceeds directly to the loan. But Pennymac did not do so because it believed the rebuild to be economically feasible. However, Pennymac eventually believed otherwise and chose to apply the insurance proceeds to the loan on February 3, 2020. (Docket No. 97 at ¶ 136; Docket No. 167-1 at ¶ 22.)

Ms. Lawson addresses the issue of economic feasibility in her response to Pennymac's summary judgment motion, but only in a minimal and cursory fashion. She states, "I have already addressed items 4.a and 4.b (the economic infeasibility of a rebuild with Southwest or Pennymac as the bank)." (Docket No. 208 at 5.) She then points to various paragraphs within three other documents: her 55-page response to Pennymac's SUMF; her 33-page declaration; and her 33-page "continued" response to Pennymac's SUMF. (*Id.* (citing Docket Nos. 207, 207-1, 207-2).) However, this response does not point out the existence of genuine issues of material fact, address the merits of her legal claims, or set forth any legal arguments, let alone any legal arguments that are responsive to Defendant's summary judgment motion. Instead, Ms. Lawson presumably expects the court to piece her argument together based on these additional documents.

Even though Ms. Lawson is proceeding *pro se*, the court cannot develop legal theories and arguments for her. *See Guarino v. Brookfield Twp. Trs.*, 980 F.2d 399, 406 (6th Cir. 1992) ("[I]t seems to us utterly inappropriate for the court to abandon its position of neutrality in favor of a role equivalent to champion for the non-moving party: seeking out facts, developing legal theories, and finding ways to defeat the motion."). Ms. Lawson clearly believes that it was not economically feasible to repair or replace her home, but she has failed to adequately address Pennymac's SUMF

18

and legal arguments that repair or restoration was economically feasible.[8] As detailed above, she does not clearly or directly point the court to evidence to rebut the facts upon which Pennymac relies.

Nevertheless, the court combed through Ms. Lawson's 55-page response to Pennymac's SUMF and found references to economic feasibility within several footnotes. (Docket No. 207 at 11, 16–20.) In these footnotes, Ms. Lawson points the court to other documents that she believes "show rebuild not economically feasible." (*Id.*) These include correspondence from Ms. Lawson to her former lender, SWBC, in December 2017 (Docket No. 203-9) and to Pennymac in November and December 2018 (Docket Nos. 203-10, 203-12 to 203-17). She contends that these letters informed Pennymac of her "financial troubles," including septic tank repairs, money taken by her former spouse, issues obtaining bids and plans using only her "external funds," and a need to obtain financial relief. (Docket No. 207 at 17–19.) However, in the same letters, Ms. Lawson consistently seeks Pennymac's approval of certain plans or design elements to further the rebuild. Further, these letters are dated after November 2, 2018, which is the date when Pennymac took over the loan and the latest date that Ms. Lawson believes Pennymac should have known that it was not economically feasible for her to repair or restore her property. (Docket No. 97 at ¶¶ 41, 162, 164.) Although Ms. Lawson may have faced "financial troubles" that no doubt would have made her rebuild more difficult or costly, that alone does not render repair or restoration of her property economically infeasible.

---

[8] Ms. Lawson also appears to believe that the deed of trust requires the lender to retroactively apply the insurance proceeds to the loan on the date when repair or restoration was no longer economically feasible. However, the court cannot find where Ms. Lawson points to any language within the deed of trust that would mandate a retroactive application.

19

In the face of Pennymac's motion and specific identification of the lack of evidence supporting Ms. Lawson's claims, it falls upon Ms. Lawson to set forth significant probative evidence in support of her claims. *Goins v. Clorox Co.*, 926 F.2d 559, 561 (6th Cir. 1991). As the party carrying the ultimate burden of proof for her claims at trial, Ms. Lawson must show that she has evidence, which if accepted as true, is sufficient to support her claim and to enable a reasonable jury to find in favor of her on her claim. *Rodgers*, 344 F.3d at 595. Conclusory allegations, speculation, and unsubstantiated assertions – of which Ms. Lawson's response is largely comprised – are not evidence and are not sufficient to defeat a well-supported motion for summary judgment. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990). While the court recognizes that the lack of counsel may well have hampered Ms. Lawson's ability to provide a convincing response to the motion for summary judgment, the court's consideration is limited to the actual response filed by Ms. Lawson. For the reasons discussed above, Ms. Lawson's response is simply not sufficient to show that genuine issues of material fact exist on her breach of contract claim that would warrant this case proceeding to trial.[9]

## V.    RECOMMENDATION

Based on the foregoing, it is respectfully **RECOMMENDED** that Defendant Pennymac Loan Services, LLC's motion for summary judgment (Docket No. 165) be **GRANTED** and that this action be **DISMISSED WITH PREJUDICE**.

---

[9] Because the court finds no genuine issue of material fact with respect to the question of economic feasibility, the court will not address Pennymac's arguments that Ms. Lawson abandoned the specific breach of contract claim that she included in the operative complaint; that Ms. Lawson should be equitably estopped by her own statements and conduct from claiming that repair or restoration was not "economically feasible;" or that Ms. Lawson cannot recover damages for emotional distress and that Pennymac is entitled to a set-off based on a settlement between Ms. Lawson and former defendant SWBC.

20

ANY OBJECTIONS to this Report and Recommendation must be filed within fourteen (14) days of service of this Report and Recommendation and must state with particularity the specific portions of this Report and Recommendation to which objection is made. *See* Rule 72(b)(2) of the Federal Rules of Civil Procedure and Local Rule 72.02(a). Failure to file written objections within the specified time can be deemed a waiver of the right to appeal the District Court's order regarding the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Any response to the objections must be filed within fourteen (14) days after service of objections. *See* Rule 72(b)(2) of the Federal Rules of Civil Procedure and Local Rule 72.02(b).

Respectfully submitted,

BARBARA D. HOLMES
United States Magistrate Judge